THE STATE EX REL. BOYCOTT, Appellant, vs. THE MAYOR AND COMMON COUNCIL OF LA CROSSE and another, Respondents.

*September 6 — October 30, 1900.*

*Municipal corporations: Amendment of charter: Adoption of portions of general city charter law.*

Under sec. 926, Stats. 1898, any city, incorporated under a special charter, is authorized to adopt, by ordinance, the provisions of any chapter, subchapter, section, or subdivision of a section of the general city charter law (ch. 40a, Stats. 1898), as an addition to or in lieu of provisions of its charter. Subch. XVIII of ch. 40a (secs. 925–172 to 925–200), entitled "City Improvements," relates, among other things, to the establishing and recording of grades for streets; the proceedings to be taken for their improvement, including the raising of the necessary funds therefor; and the assessment of benefits and damages to the abutting lot owner upon the alteration of an established grade, or the doing of any work on the streets at the expense of the real estate benefited, with right of appeal to the circuit court. The common council of La Crosse, a city incorporated under a special charter, by ordinance, adopted sec. 925–175 and secs. 925–177 to 925–197, leaving out the other sections of subch. XVIII. Sec. 925–173, one of the omitted sections, requires the establishment and recording of the grade of *all* streets, and prohibits work thereon until such grade is established and recorded. and its provisions do not appear, either in form or substance, in any part of the special charter of La Crosse. *Held,* that the omission of sec. 925–173 was a substantial and material change in the law as passed by the legislature, and therefore fatal to the validity of the ordinance.

APPEAL from a judgment of the circuit court for La Crosse county: R. G. SIEBECKER, Judge. *Reversed.*

This is an action of *certiorari* brought in due time, under the provisions of ch. 165, Laws of 1899, to test the validity of the attempted adoption by the common council of the city of La Crosse of certain sections of ch. 40a of the Statutes of 1898, being what is known as the general city charter law. The city of La Crosse is a city incorporated under a special charter, viz. ch. 162, Laws of 1887. On the 13th day of April, 1900, the common council attempted by ordinance

to adopt certain sections of subch. XVIII of said ch. 40a; the adoption being made under that part of sec. 926, Stats. 1898, which authorizes cities incorporated under special charters to adopt by ordinance the provisions of any subchapter, section, or subdivision of a section of chapter 40a, in addition to or in lieu of the provisions of its special charter. Subch. XVIII aforesaid is entitled "City Improvements," and is intended to govern that subject. Its sections are numbered from 925–172 to 925–200, inclusive. The ordinance in question attempted to adopt sec. 925–175 and secs. 925–177 to 925–197, inclusive, leaving out secs. 925–172, 173, 174, 176, 199, and 200.

In order to understand the questions involved, it will be necessary to state the contents of the various sections of subch. XVIII aforesaid, either at length or in substance, and such statement is as follows:

"Sec. 925–172. The council shall have authority to establish the grade of all streets and alleys in the city, and to change and re-establish the same as it may deem expedient; provided, that whenever it shall change or alter the permanently established grade of any street any person thereby sustaining damages to his property on such street shall have a right to recover such damages in the manner set forth in this subchapter.

"Sec. 925–173. The grade of all streets shall be established and described, and the adoption of such grades and all alterations thereof shall be recorded by the city clerk. No street shall be worked until the grade thereof is established and recorded in the manner herein set forth.

"Sec. 925–174. The streets shall be divided into a carriage way and a sidewalk on each side thereof; the sidewalk shall be for the use of persons on foot, and no person shall be allowed to incumber the same with boxes or other material; but such sidewalk shall be kept clear for the uses specified herein.

" Sec. 925-175. The city may cause streets and alleys to be opened, leveled, graded, regraded, graveled, regraveled, macadamized, paved and repaved with stone, wood or other material or improved in any other manner, and may cause such streets and alleys to be swept, sprinkled and cleaned; but no street shall be graded, graveled, paved, macadamized or improved, where the expense exceeds five hundred dollars, except upon the vote of two thirds of the members of the council elect. The expense of such work or improvement may be paid in whole or in part by the city or by the property to be benefited thereby, as the council shall direct, but in no case shall the amount assessed to any parcel of real estate exceed the benefit accruing thereto by such improvement, except in case of sidewalks; provided, that where work is ordered to be done and the expense thereof is made chargeable to particular property the city shall in no case be responsible for the payment therefor except in cases where the cost of the improvement exceeds the benefits.

" Sec. 925-176. In any city whenever the owners of more than one half of the frontage of the lots upon that part of any street proposed to be improved shall petition the common council to improve such street or part of street by stone paving, macadam or otherwise as set forth, to be made in such manner as shall be fully specified by the city surveyor and approved by the mayor, and upon advertisement setting forth clearly such specifications, such city may contract for such work to be done by the lowest responsible bidder if deemed reasonable in cost, or in case of macadam it may have the work done by men in the employ of the city; provided, that such improvement, unless made to connect with streets somewhat similarly improved, shall be made to extend upon such street not less than the length or width of three blocks of lots and the street crossings between. The cost of such improvement when made shall be assessed to the respective owners of the lots fronting on such street in the

ratio of each owner's number of feet front to the entire length of such improvement, exclusive of street crossings, which shall be chargeable to the city as its proportion of expense, and such crossings shall be made to conform with the street so improved. The word street as herein used may be construed to mean two or more streets when the whole taken together would form one continuous drive."

Sec. 925–177 provides for the construction of cross walks and the repairing of streets, to be paid out of the city or ward funds. Secs. 925–178 to 925–185, inclusive, contain specific provisions for the assessment of benefits and damages upon the alteration of any established grade or the doing of any work upon any streets at the expense of real estate benefited, and provide for an appeal to the circuit court from such assessment, which is declared to be the only remedy of the property owner for the redress of any grievance by reason of the making of the improvement or of a change in any established grade. Sec. 925–186 provides for the methods of advertising for bids for the work. Sec. 925–187 gives power to reject bids. Secs. 925–188 and 925–189 provide for the execution of certificates against the lands benefited, to contractors, and specify that such certificates shall be conclusive evidence of the legality of the proceedings after the expiration of nine months from their date, and also provide for the insertion of the amounts thereof in the tax roll. Sec. 925–190 provides that a contract for street improvements may provide that the amount chargeable by way of benefits may be paid with certificates against lots or in special improvement bonds, or in the proceeds of the sale of such bonds. Secs. 925–191 to 925–197a, inclusive, contain general provisions authorizing the issue and execution of special improvement bonds, and the effect of such bonds when executed, and the method of foreclosure thereof. There is no section 925–198. Secs. 925–199 and 925–200 provide that, until a board of park commissioners shall be provided

for, the public parks of the city shall be in charge of the
board of public works, and that the common council of
the city shall have full power to legislate for public parks,
subject, however, to the proviso that the question of the
establishment thereof be first decided in the affirmative by
vote of the electors of the city.

These facts appearing upon the return of the writ of *cer-
tiorari*, the proceedings of the common council were affirmed
by the circuit court, and the relator appeals.

For the appellant there was a brief by *McConnell &
Schweizer*, and oral argument by *J. E. McConnell*.

*W. F. Wolfe*, for the respondents.

WINSLOW, J.   The facts in the present case are similar to
those presented in the case of *Adams v. Beloit*, 105 Wis. 363,
with the important difference that in the *Adams Case* the
ordinance of adoption included the whole of subch. XVIII,
set forth in the statement of facts, except sec. 174, whereas
the ordinance attacked in the present case omits secs. 172,
173, 174, 176, 199, and 200.

The conclusions reached in the *Adams Case* were, in sub-
stance, that the statutory provision authorizing a city acting
under a special charter to adopt a part of the general charter
law is valid, at least as applied to the adoption of an integral
part of the law, complete in itself; that this is option legis-
lation, uniform in its operation, and is not special legislation,
although the option is confined to a class.   The discussion
of the general subject in that case was the result of the
fullest consideration which we were able to give it, assisted
by very complete and able arguments.   We have seen no
reason to re-examine the positions there laid down, nor were
we asked to do so in the present case.   Counsel for the ap-
pellant in the present case accept the result reached in the
*Adams Case*, but contend that the attempt has been made
here to adopt only a fragment of a law, and to leave out
important sections which are essential parts of the scheme

for city improvements as enacted by the legislature, and that this cannot be legally done under the well-established principles applicable to option legislation. This contention presents for consideration serious and interesting questions. The principle that an option law, in order to be valid, must be a complete law in all its terms and provisions, when it leaves the legislative branch of the government, so that nothing is left open, save the determination of the prescribed fact upon the happening of which it is to go into effect, is so well settled as to require no discussion. It must be a complete law in all its details *in præsenti*, but may be left to take effect *in futuro*. *Dowling v. Lancashire Ins. Co.* 92 Wis. 63. Any other rule would result in a practical delegation of legislative power. If the governing body of a municipal corporation can take such parts as it chooses from a complete law, and reject such parts as it chooses, the result will be, not the law which the legislature has enacted, but a law which the corporation has enacted. In such a case the legislature has never said that the parts chosen by the corporation should constitute a law, standing by themselves, but the governing body of the corporation has said so. This must be legislation, or it is nothing; and, if it be legislation, it is legislation by the municipal corporation, and not by the legislature. It may be said that this view is inconsistent with the result reached in the *Adams Case*, but we think not. In that case it was, in effect, held that a part of the general charter governing a particular subject, and which was complete in itself, might and should be considered as a separate and complete law upon the statute book, and thus might legally come under the general principle sustaining option legislation. It may be that the rule adopted in that case carried the doctrine by which option legislation is sustained to the limit, but it must be remembered that when laws are attacked as unconstitutional the courts will go as far as possible, consistent with reason and sound legal principles, to sustain the laws. In that case the whole of subch. XVIII, except

sec. 174, was adopted, and it was deemed the adoption of a complete law on the subject of city improvements; the omission of sec. 174 not being regarded as important, and the question as to the effect of its omission not having been raised or argued in the case. Indeed, the provision of sec. 174 would seem to add nothing to the law, for the reason that its provisions are simply a reaffirmation of provisions either expressly or impliedly contained in every municipal charter, and which have been universally applied from time immemorial.

In the present case, however, a number of additional sections were omitted; and the question is whether it can be said, in view of these omissions, that the council has exercised a valid option by accepting a complete law as it left the legislature, or has it attempted to accept a part only of a law, and thus in effect legislated for itself? The legislative scheme for the construction of city improvements, as disclosed by subch. XVIII, may be briefly stated as follows: The power to establish and change grades is vested in the council, with the proviso that any property owner damaged by the change of an established grade shall be entitled to recover such damages. The council are required to establish grades and cause them to be recorded in the clerk's office, and no street can be worked until after the establishment and recording of the grade. Streets may be graded, paved, or improved by vote of the council, and the expense, either in whole or in part, paid by the city, or the property benefited; but no assessment of benefits shall exceed the actual benefit, except in case of sidewalks. When the owners of more than one half the lots fronting on a street shall petition for a specified pavement, approved by certain officials, such paving may be done, and the expense charged against the abutting lots by the front-foot rule. Cross walks and repairs shall be paid for out of city or ward funds. The benefits and damages resulting from change of established grade or from any street work to be done at the expense of

property benefited shall be assessed and fixed by the board of public works, subject to final review and correction by the council. A landowner may appeal from such assessment, and the remedy by appeal is exclusive. Bids for the work shall be secured in a specified way, and contractors shall be paid either in certificates, improvement bonds, or cash, as determined by the council. Improvement bonds may be issued at the option of lot owners, with certain specified characteristics and legal effect.

So far as necessary for the present purpose, the foregoing may be said to be the substance and effect of the law governing street improvements as it left the legislature. Can this be said to be the substance and effect of the law which the council of the city of La Crosse attempted to adopt? We think this question must be answered in the negative.

It may be granted that the city had and still has power, under its special charter, to establish and change grades, so that the failure to adopt the first clause of sec. 172 is immaterial. Leaving this omission, therefore, out of consideration, we find that the council has attempted to eliminate from the law passed by the legislature (1) the provision that a property owner may recover his damages for a change of established grade; (2) the requirement that the grade of all streets shall be established and recorded; (3) the prohibition against the working of any street until the grade is established and recorded; (4) the provision allowing the owners of more than one half the frontage on a street to cause the street to be paved, and paid for by assessments on abutting lots under the front-foot rule. With these substantial omissions, we do not see how it is possible to say that any complete law passed by the legislature, governing street improvements, has been adopted by the council. It was argued that the omission of the proviso in sec. 172 giving a property owner the right to recover damages for a change of established grade is immaterial, because all the legal machinery for the recovery of such damages is contained in

secs. 178 *et seq.* of the chapter, and that these latter sections were all adopted by the ordinance. Admitting (but not deciding) that this contention may be sound, what can be said which will excuse the omission of sec. 173, which requires the establishment and recording of the grade of *all* streets, and prohibits the working of any street until its grade is established and recorded? Here is a positive requirement, which the legislature deemed an essential part of the system, which has been dropped out by the council, and which does not appear, either in form or in substance, in any part of the special charter of the city of La Crosse. It cannot be called trivial or unimportant. It was evidently framed to secure to the property owner the right to have a permanently established grade fixed, and recorded where he can examine it, before any work be done on the street, or assessments made against his property. Without this provision, the council might actually work the street and change its surface up or down as many times as they chose, and levy assessments therefor every time, and the property owner would have no redress for the change of actual grade, so long as the council had not permanently established a grade. This seems to be the very thing that the legislature intended to guard against,— the safeguard which the property owner was intended to have,— and it is the very safeguard which the council have denied him. The legislature have said that he should have it. The council have said he should not have it. This is not the exercise of an option on existing legislation. It is legislation itself.

Regardless of the effect of the elimination of sec. 176 (which is also a serious question), we cannot but regard the omission of sec. 173 as a substantial and material change in the law as passed by the legislature, and hence fatal to the ordinance.

We are not unmindful of the importance of the question presented, nor of the probable far-reaching effects of this ruling, and for those reasons have given the case most care-

ful consideration. As a result of this consideration, the con-
clusions reached seem inevitable and free from all reasonable
doubt, and, such being our conclusions, we should fail in
our duty, did we not declare them.

*By the Court.*— Judgment reversed, and action remanded
with directions to reverse the proceedings of the city coun-
cil by which the ordinance was adopted.

MARSHALL, J. With the conclusion reached in this case,
notwithstanding some misgivings as to its correctness, I
concur because I cannot see that a different result can be
reached with sufficient clearness to overbalance the weight
which an associate justice should give to the opinions of his
companions on matters that admit of a reasonable doubt as
to their proper solution. I write this opinion because of a
grave question which, in one view of the case, is involved,
that has never been decided by this court or presented for
its consideration. Without expressing any decided opinion
in regard to the question at this time, I am inclined not to
allow the case to pass in such a way that it may hereafter
be said that the point was not thought of. Before this court
shall be called upon to decide such question the public in-
terests demand that it be fully presented at the bar by able
counsel. It is one so far-reaching as to call for the best
efforts of the most eminent counsel and the most careful
judicial study by the members of this court in order to arrive
at a correct conclusion.

Neither *Dowling v. Lancashire Ins. Co.* 92 Wis. 63; *In re
North Milwaukee,* 93 Wis. 616; *State ex rel. Adams v. Burdge,*
95 Wis. 390; *Adams v. Beloit,* 105 Wis. 363, nor any case
found in our Reports on the subject of the constitutional
power of the legislature to delegate authority to say when
and under what conditions a law shall take effect, rules this
case. The power to make laws, strictly so called, using the
term in its general sense, being vested exclusively in the
senate and assembly by the constitution, obviously, any at-

tempt to delegate it to any other body or governmental instrument would be void. Upon that principle, in *Dowling v. Lancashire Ins. Co.*, a delegation of authority to the com-, missioner of insurance to make a law, in *State ex rel. Adams v. Burdge* an attempt to delegate such authority to the state board of health, and in *In re North Milwaukee* a like attempt, so held, to delegate power to the circuit courts, were considered, and the legislation condemned. Each of such cases was unquestionably decided right if the principle of undoubted soundness referred to was correctly applied. There is no room for controversy but that the legislature may make a law and clothe municipal bodies with power to say when it shall take effect in their respective corporate communities. Upon that principle *Adams v. Beloit* was decided. The two principles mentioned were supposed, by the counsel who presented this case to the court below and argued it here, to necessarily govern the same. No other idea seems to have been thought of. The case was decided in the court below with that view and has been likewise decided here.

Has not the full scope of sec. 32, art. IV, of the constitution, been overlooked, and does it not expressly authorize the delegation of power to amend special city charters? That is the question to which I have referred. Sec. 1 of such article says that the legislative power of the state shall be vested in a senate and assembly. That obviously limits the power to make general laws to the supreme legislative body, but it may constitutionally intrust to local governing bodies power to legislate as to their local affairs independent of sec. 32, art. IV. That has never been doubted. Cooley, Const. Lim. 226; 3 Am. & Eng. Ency. of Law (1st ed.), 698. In applying the principle that legislative power cannot be delegated, one must distinguish between general laws and mere local regulations. *Metcalf v. St. Louis*, 11 Mo. 102; *Markle v. Akron*, 14 Ohio, 586, 590; *Covington v. East St. Louis*, 78 Ill. 548; *Stilz v. Indianapolis*, 55 Ind. 515; *Kelly v. Meeks*, 87 Mo. 396, 401.

So it seems that if the act of the common council of La Crosse cannot be sustained as a legitimate exercise of authority to say when a law shall take effect, we should inquire as to whether it is sustainable as a local regulation, or as an administrative act, under a power intrusted to inferior legislative bodies by constitutional authority. In that, in addition to the accepted doctrine referred to regarding the making of mere local regulations, we must turn to secs. 31 and 32, art. IV, of the constitution. Sec. 31 expressly prohibits the legislature from enacting special or private laws in certain cases specified, one being for the incorporation of any city, town, or village or amending the charter thereof. If that section and sec. 1 of article IV exclusively govern the subject, obviously the things prohibited cannot be done at all except in so far as they are proper subjects of local legislation or administration under general laws according to the principle heretofore referred to, or by option laws. But sec. 31 is but one of two parts of the change in the constitution from its original condition, the two parts being dependent upon each other. They were coupled together and adopted under such circumstances as to clearly indicate that neither would have been approved without the other. It required the entire change in the constitution to express the idea which the people had in mind as to the matter referred to. The additional provision is contained in sec. 32 as follows: "The legislature shall provide general laws for the transaction of any business that may be prohibited by section 31 of this article, and all such laws shall be uniform in their operation throughout the state." One can but note the significance of the words "shall provide general laws for the transaction of any business that may be prohibited," etc. Can that be accomplished without the delegation of authority to some governmental instrument or instruments to do the things prohibited? We have not yet been able to answer that question satisfactorily in the affirmative having in mind a method.

The idea expressed in sec. 32 is plainly not that the legislature shall, by general laws, do the things prohibited, but that it shall pass general laws of such a character that other appropriate bodies—boards, councils, or courts—*may, in the exercise of their authority, do the prohibited things.* In harmony with that idea general laws were passed immediately after the change in the constitution which, with those already in existence, furnished methods of doing everything mentioned in sec. 31. The power to change names was vested in circuit courts. Sec. 3520, Stats. 1898. The power to constitute one person the legal heir of another was vested in the same tribunals. Sec. 3521, Stats. 1898. The power to lay out highways was vested in town boards and other corporate bodies having charge of local affairs. Ch. 52, Stats. 1898. The power to grant ferry franchises was vested in county boards. Ch. 53, Stats. 1898. The power to authorize a sale of lands of persons under disability was vested in the circuit courts. Ch. 151, Stats. 1898. The power to locate or change county seats was vested in the people of the respective counties to be exercised under certain specified conditions. Sec. 655, Stats. 1898. The power to extend the time for the collection of taxes was vested in town boards and in city and village councils. Sec. 1108, Stats. 1898. The power to create private corporations was given to any three adult residents of this state who might desire to exercise it for any of the purposes mentioned in the statute upon their complying with the statutory conditions. The power to amend private corporate charters was vested in the stockholders of the corporations. Ch. 86, Stats. 1898, particularly secs. 1771 to 1774. The power to apportion the state school fund was vested in the state superintendent of public instruction. Ch. 28, Stats. 1898. That of determining the existence of conditions requisite to the incorporation of villages, in effect granting village charters, was vested in the circuit courts. Ch. 40, Stats. 1898. The power to substitute the general city charter for special city charters was vested in city

councils. Sec. 925–3, Stats. 1898. The power to amend city charters as regards ward boundaries was vested in city councils. Sec. 925–14, Stats. 1898. That of extending corporate limits by adding territory less than that included within the limits of a town, city, or village was vested in the councils. Sec. 925–17, Stats. 1898. That of adding to a city the entire territory of an adjacent city, town, or village, was vested in the governing bodies of the respective corporations. Sec. 925–18, Stats. 1898. *The power to amend special city charters as to any idea covered by the general city charter was vested in the city councils to be exercised in each case by the adoption by such councils of any chapter, subchapter, section, or subdivision of a section of such general charter covering such idea.* Sec. 926, Stats. 1898.

Is there a difference between power to amend the charter of a private corporation and that to amend the charter of a municipal corporation? Is not one the exercise of power to make law as much as the other? I have not yet been able to answer those questions in the negative. It would seem that, among the general laws to which we have referred, are several delegations of power exercised exclusively by the legislature acting directly in each particular instance before the constitution was amended. How can the doing of those things now, by municipal bodies authorized thereto by general laws, be the exercise of legislative power, since the legislature no longer has such power? If it has the power to delegate authority generally to cities to amend their charters, that power to delegate cannot be delegated. But how does that militate against cities administering, as to their respective charters, a delegated power, vested in them under the constitution, to change such charters? If the legislature may intrust to city councils power to do the business of amending their charters, obviously acts in that regard have the force of law. They are laws to all intents and purposes the same as if made by supreme legislative authority.

Now, how can we say the legislative method of amending city charters is inherently imperfect, if it even goes as far as we have suggested, since the legislature, under the constitution, is clothed with unlimited discretion as to the method to be adopted? It will be observed that there is no limitation in that regard, except that the general scheme adopted for doing things which can no longer be done by special legislative enactments must be uniform throughout the state. If the delegation of authority by a general law, to an inferior legislative tribunal, to do one of the things prohibited, be in effect a delegation of authority to make law, does that condemn it in view of the unrestricted command of the constitution? And why is the exercise of such authority the exercise of any power vested in the legislature, since such authority cannot be exercised by the senate and assembly?

Many instances might be mentioned where legislative functions have commonly been exercised in local matters, both before and since the amendment of the constitution, by the governing bodies of municipal corporations. Significant among them is the granting of franchises. Such grants have uniformly been upheld and said to be in effect acts of supreme legislative authority done through legitimate legislative agents. *Ashland v. Wheeler*, 88 Wis. 607; *State ex rel. Att'y Gen. v. Madison St. R. Co.* 72 Wis. 620; *State ex rel. Att'y Gen. v. Portage City W. Co., ante*, p. 441.

The foregoing illustrations are not deemed delegations of power to make law, strictly so called, but of power to execute or administer law. The administrative acts relate back to and receive force as law from the supreme legislative head. The supreme authority is sufficiently exercised when it intrusts to another body power to do the thing in the particular instance. The result of the exercise of such authority is no more than an administrative act or special regulation or provision, but with the same force and effect as a special

legislative act when power to so legislate exists. *State ex rel. Childs v. Darrow,* 65 Minn. 419.

In the adoption of the amendments to the constitution referred to, there was evidently no intention to do more than to limit the method of doing the things mentioned, taking away from the legislature the power to do such things by special legislation and requiring the adoption of laws enabling the doing of them without any resort to the legislature in particular instances. Now the legislature, pursuant to the constitutional amendment, having devised a scheme for the amendment of special city charters, no reason is perceived why it cannot be followed, regardless of whether it contemplates indirect special legislation. Obviously, any attempt to amend a city charter not in accordance with the legislative plan is void. The plan that has been adopted is to intrust the common councils of cities having special charters with power to amend them by adopting a chapter, subchapter, section, or subdivision of a section of the general city charter law. If that means that a part of the general charter law may be added to a special charter, though it cover but an idea which in the general law is combined with others covering an entire subject of municipal affairs, why it is not constitutional to its full extent as well as if it allowed only the adoption of an entire legislative scheme, under the option law principle, is not readily answered so as to support a theory contrary to that here suggested.

Enough has been said to bring out clearly the idea that the constitution expressly authorizes and commands the legislature by general laws to intrust to some agency the power to do each and every thing which it cannot do directly by reason of sec. 31, art. IV, of the constitution; that one of those things is the amendment of special city charters; that an amendment so made, though having the force of law, is in itself a mere executive or administrative act; and that it is a fair question as to whether the act challenged in this case may be sustained if the legislative plan for changing spe-

·cial city charters has been followed, regardless of the option law doctrine which ruled *Adams v. Beloit*, 105 Wis. 363.

Applying the foregoing to the case in hand, and assuming ·all the power suggested to exist in city councils, I am unable to say that the legislative plan for amending respond-·ent's charter was followed. The difficulty grows out of the ·omission to adopt sec. 925–173, Stats. 1898. The idea expressed in such section is by its express language impliedly ·carried forward and made a proviso to every other section. By its omission, the adoption of other sections did not adopt ·a single idea expressed by the legislature upon the subject of street improvements. The omitted section prohibits any ·street from being worked till its grade shall have been es-:tablished, described, and recorded as provided in the scheme for street improvements which follows. We cannot say that ·any legislative idea in the entire scheme is complete without ·a recognition of sec. 925–173. In that view, whether the validity of the action of the common council be tested by the ·option law doctrine or by the theory that the legislature is not limited to that method of authorizing amendments to ·special city charters, the result is the same.

In this and all other cases where the question of amending special city charters since the adoption of the amendment to the constitution has been presented to this court, great ·significance has been given to a supposed constitutional ·policy to prohibit special changes in city charters, and to bring all such charters into harmony with each other. A moment's reflection will lead to the conclusion that there ·was no such intent as to special city charters. They were not abolished. It was contemplated that they would remain in force, that power to change them would be pre-·served, and that some general plan would be adopted by the legislature for its exercise. The idea was not to prohibit ·changes in such charters, but to prohibit changes by special ·legislation, and to provide generally some other method of ·making such changes.