State ex rel. Van Alstine v. Frear, 142 Wis. 320.

STATE EX REL. VAN ALSTINE, Appellant, vs. FREAR, Secretary of State, and another, Respondents.

*February 25—April 5, 1910.*

*Constitutional law: Delegation of legislative power: Statutes: Referendum: Stare decisis: General and local laws: Publication after vote of people: "Approval:" Primary elections: Nominations for office: Political conventions: Abridging right of assemblage: Elections: Official ballots: Regulation: Discrimination between candidates: Voting for candidate of other party: Qualifications for office: Declaration of candidate: Election of U. S. senator: Primary nominations advisory only.*

1. Except as authorized by the constitution the legislature cannot delegate power to make a law.
2. The legislature may, however, make a law to become operative on the happening of a certain contingency or on the ascertainment of a fact upon which the law makes or intends to make its own action depend.
3. A decision on a constitutional question that has long been considered the settled law of the state should not be lightly set aside,.

State ex rel. Van Alstine v. Frear, 142 Wis. 320.

though the court as presently constituted might reach a different conclusion if the question were a new one.

4. The question whether or not a general law shall become operative may be referred by the legislature to a vote of the electors of the state. Such reference does not involve any delegation of power to make a law. *Smith v. Janesville*, 26 Wis. 291, followed. MARSHALL, J., concurs on the ground of *stare decisis* only.

5. As to the right of referendum, no distinction between local and general laws is recognized in our constitution, and there is no difference in principle. MARSHALL, J., dissents.

6. Ch. 451, Laws of 1903, which declared that the provisions thereof relating to primary elections should go into effect only after being approved or ratified by the people of the state at the next general election, was a complete law when it received the executive sanction and was published in the official state paper; and publication thereof after it had been ratified by the popular vote was not essential.

7. In sec. 329, Stats. (1898), providing that all general laws shall be published immediately after their passage and approval, the word "approval" refers to executive approval.

8. Ch. 451, Laws of 1903, providing for primary elections to nominate party candidates for office, and denying the right of the nominees of conventions, as such, to a place on the official ballot, does not abridge "the right of the people peaceably to assemble, to consult for the common good," guaranteed by sec. 4, art. I, Const.

9. The legislature has power to prescribe reasonable regulations governing the manner in which names may be placed on the official ballot, printed and distributed at public expense.

10. The fact that a person nominated for an office by nomination papers, as provided in secs. 30–32, Stats. (1898), may have as many signatures to his petition as he can get, while a candidate for nomination on a party ticket to be voted for at a primary election, under ch. 451, Laws of 1903, is restricted as to the number of signatures he may procure, does not show such a discrimination against the candidate at the primary as renders the act of 1903 invalid, the conditions and the circumstances applicable thereto being different in the two cases.

11. Legislation on the subject of elections is within the power of the legislature so long as it merely regulates the exercise of the elective franchise and does not deny the franchise itself either directly or by rendering its exercise so difficult and inconvenient as to amount to a denial.

State ex rel. Van Alstine v. Frear, 142 Wis. 320.

12. The fact that under ch. 451, Laws of 1903, the members of one political party may vote at the primaries for candidates of a different party, does not render the law invalid.

13. The requirement in ch. 451, Laws of 1903, that each candidate to be voted for at the primary shall file a declaration that he will qualify for the office if nominated and elected, does not render the act invalid as prescribing a qualification for office additional to those required by the constitution.

14. The provisions in ch. 451, Laws of 1903, for the nomination at primary elections of party candidates for the office of United States senator do not impose any legal obligation upon any member of the legislature to vote for his party nominee or restrict the choice to persons who were voted for at the primary, and do not forbid the members of the legislature from making nominations or prevent the holding of caucuses for that purpose, but merely afford an opportunity for the people to express their preference and for the legislators to become advised as to public sentiment, and hence do not contravene the federal constitution or the federal statutes respecting the election of United States senators.

15. The action of the electors in nominating, at the primary, candidates for the office of United States senator, amounts to nothing more than an exercise of the right of petition.

APPEAL from an order of the circuit court for Dane county: MARTIN L. LUECK, Judge. *Affirmed.*

For the appellants there were briefs by *J. Elmer Lehr* and *Charles F. Lamb,* attorneys, and *C. F. Lamb,* of counsel, and a supplemental and reply brief by *J. Elmer Lehr* and *C. F. Lamb,* attorneys, and *Thomas M. Kearney* and *J. Elmer Lehr,* of counsel; and the cause was argued orally by *C. F. Lamb, J. Elmer Lehr,* and *W. D. Thompson.*

The *Attorney General* and *Russell Jackson,* deputy attorney general, for the respondent.

The following opinion was filed April 5, 1910:

BARNES, J. This is a taxpayer's action, brought to enjoin the secretary of state from preparing and transmitting to the several county, town, city, or village clerks of the state of Wisconsin notices designating the offices for which can-

didates are to be nominated at the primary election, as required by ch. 451, Laws of 1903, to be held in September, 1910, and from performing all other acts required by him to be performed by said chapter, and from auditing any claims or accounts for expenses arising out of any acts required to be performed under said chapter, and from drawing any warrant or order upon the state treasurer in payment thereof, and also enjoining the state treasurer from paying any warrant or order drawn on him because of any expense incurred under the aforesaid chapter. The relator appeals from an order sustaining a general demurrer to the complaint.

The validity of said ch. 451, popularly known as the "Primary Election Law," is assailed on five grounds: (1) Because the act in question has no validity unless it is in force and effect by virtue of legislative power delegated by the legislature to the voters of the state; (2) because the act in question is a general law and was never published after its final approval by the voters of the state; (3) because the act in question abridges the right of the people to assemble and consult for the common good; (4) because the act unlawfully and unreasonably limits the rights of candidates for office in securing support from voters and the rights of voters to participate in the selection of candidates for office; (5) because the act in question operates to coerce the judgment and discretion of the legislature in choosing United States senators, and unlawfully regulates the manner of choosing such senators, and operates to secure their election by popular vote.

1. Sec. 26 of said ch. 451 provides:

"The question whether the foregoing provisions of this act shall take effect and be in force shall be submitted to the people of this state, in the manner provided by law for the submission of an amendment to the constitution, at the next general election to be held in November, 1904. If approved by a majority of the votes cast upon that question, it shall go into effect and be in force from and after such ratification by the people; otherwise it shall not take effect or be in force."

Sec. 28 of the act provides:

"This act shall take effect and be in force from and after its passage and publication subject to all provisions herein contained for its submission to the people for their ratification or rejection."

Sec. 1 of art. IV of the constitution of Wisconsin provides: "The legislative power shall be vested in a senate and assembly."

It is argued that the legislative power involves not only the function to declare what the law shall be, but also the function to declare when it shall go into effect, and that both must be exercised before the law is complete, and both call for an exercise of judgment and discretion on the part of members of lawmaking bodies, and that legislative power can only be delegated to such bodies as the constitution permits it to be delegated to, and that such power must be delegated in the manner prescribed by the constitution.

If the premise is accurate that legislative power was attempted to be delegated to the people by ch. 451, then the conclusion that the law is void is supported by such an abundance of authority that the rule of *stare decisis* should be applied. Except as authorized by the constitution the legislature cannot delegate power to make a law. *Slinger v. Henneman,* 38 Wis. 504, 510; *Dowling v. Lancashire Ins. Co.* 92 Wis. 63, 69, 65 N. W. 738; *In re North Milwaukee,* 93 Wis. 616, 621, 67 N. W. 1033; *State ex rel. Adams v. Burdge,* 95 Wis. 390, 70 N. W. 347; *State ex rel. Boycott v. Mayor, etc.* 107 Wis. 654, 658, 84 N. W. 242; *Borgman v. Antigo,* 120 Wis. 296, 97 N. W. 936; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 515, 107 N. W. 500; *Nash v. Fries,* 129 Wis. 120, 108 N. W. 210; *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 162, 172, 116 N. W. 905; *State ex rel. Williams v. Sawyer Co.* 140 Wis. 634, 123 N. W. 248.

It is just as well settled that, while the legislature may

not delegate its power to make a law, it can make a law to become operative on the happening of a certain contingency or on the ascertainment of a fact upon which the law makes or intends to make its own action depend. *In re Griner,* 16 Wis. 423; *State ex rel. Att'y Gen. v. O'Neill,* 24 Wis. 149; *Smith v. Janesville,* 26 Wis. 291; *Dowling v. Lancashire Ins. Co., supra; In re North Milwaukee, supra; State ex rel. Adams v. Burdge, supra; Adams v. Beloit,* 105 Wis. 363, 81 N. W. 869; *Nash v. Fries, supra; State ex rel. Faber v. Hinkel,* 131 Wis. 103, 111 N. W. 217; *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm., supra.* The authorities elsewhere adopting the same doctrine are so numerous that it may be said they are practically unanimous.

Therefore, the question arising under sec. 1 of art. IV of the constitution is, Did ch. 451, Laws of 1903, delegate to the electors of the state the power to make that law, or was the act a complete law in itself when it received the executive sanction and was published, and which was to become operative only on the happening of a future contingency, to wit, its approval by a majority of the electorate voting on the question? The courts have very properly refrained from attempting to promulgate any general rule as to what is or what is not a proper contingency upon which the operation of a law may be made to depend. Concrete cases have been passed upon as they have arisen, and a reference to most of the cases upon the point in this court, as well as some others, with a brief statement of the contingency involved, will be found in *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm., supra.*

In support of the contention that the legislature sought to confer legislative power on the electorate, and did not enact a law that was to become effective on the happening of a contingency, it is urged that the constitution provides that certain questions may or must be submitted to the voters of the state (secs. 1, 2, art. XII; sec. 5, art. XI; sec. 22, art. IV;

secs. 7, 8, art. XIII); that this express delegation of the power of submission excludes any other or further power to submit; and that an election is not a future contingency upon which the operation of a law may be made to depend.

This court, in *State ex rel. Att'y Gen. v. O'Neill*, 24 Wis. 149, held that the question as to whether a local law should become operative might properly be submitted to a vote of the people.

In *Smith v. Janesville*, 26 Wis. 291, it was held that there was no difference in principle in this regard between a general and a local law, and that the result of an election was one of those future contingent events upon which a general law might be made to take effect.

It is not contended that the *O'Neill Case* was not correctly decided, or that the opinion of the court in *Smith v. Janesville* does not fully meet the attack on the law which is under present consideration. It is contended, however, that there is a well-recognized distinction between the right of legislative bodies to submit local measures for approval to the voters of the particular locality that is to be affected thereby and the right to submit general acts for approval to the voters of the state. Furthermore, that the decision in *Smith v. Janesville* is not in harmony with that of any other court in the country; that it has been subsequently overruled; and that, as a matter of fact, the law under consideration in that case, being an amendment to the banking law, was properly and necessarily submitted to the voters, and that, while the decision was placed on a wrong ground, it was right in fact, and the false reasons given for the decision should be treated as mere *dictum*.

It is also urged that the rule of *stare decisis* should not be applied because the decision in *Smith v. Janesville* is wrong in principle and contrary to the uniform current of judicial decision elsewhere, and because the case has been subsequently overruled.

Decisions on constitutional questions that have long been considered the settled law of the state should not be lightly set aside, although this court as presently constituted might reach a different conclusion if the proposition were an original one. As is said in *Fisher v. Horicon Iron & Mfg. Co.* 10 Wis. 351, 355:

"It is the duty of this branch of the government to pass finally upon the construction of a law, and determine whether the legislature in its action has transcended its constitutional limits, and the community has a right to expect, with confidence, we will adhere to decisions made after full argument and upon due consideration."

It is true that property rights have not grown up under the decision in question. It is also true that the legislature had the right to assume, when it enacted ch. 451, Laws of 1903, that it was a settled principle of constitutional law in Wisconsin that the question whether or not a general law should become operative might be referred to a vote of the electors of the state. This court had so declared in express terms in the *Janesville Case* more than thirty years before the law now challenged had been enacted, and that decision was subsequently cited with apparent approval in many cases, and no criticism of it had ever been indulged in. If it has been overruled, it has been by implication. The legislature must of necessity take the decisions of this court for its guidance on questions of constitutional law. When it has done so, the court should not hold that it pinned its faith to a shadow, unless some doctrine vicious in principle or fraught with grave consequences has been enunciated. It is from this standpoint and with this attitude that the court should approach the first question raised by the appellant, which is the one that was argued at the greatest length orally and in the briefs, and apparently the one most relied on for a reversal of the order in this case.

If a law like the one under consideration does in fact con-

fer or attempt to confer legislative power on the electors of the state, then the decision in *Smith v. Janesville* has been overruled by implication by the subsequently decided cases which have been cited. But the decision in the *Janesville Case* is not in any sense based upon the proposition that any such power was in fact conferred. On the contrary, it is grounded upon the proposition that the act was a completed piece of legislation when passed by the legislature and was a complete law when signed by the governor, but nevertheless a law which would not become operative unless a future contingency happened, to wit, that it received the sanction of a majority of the popular vote. In no case subsequently decided in this court has there been a suggestion or expression of doubt that the result of such a vote was not a contingency upon which a law might or might not be made to go into operation. On the contrary, the decision seems to have been approved in a number of cases subsequently decided by this court. In *Dowling v. Lancashire Ins. Co.* 92 Wis. 63, 69, 65 N. W. 738, the court, speaking of the power of the legislature to make the effectiveness of a law dependent upon a future contingency, said:

"And accordingly the time when the act shall take effect may be made to depend upon the majority of a popular vote being cast in its favor under a submission to the electors for that purpose, provided in the act,"—citing the *O'Neill* and *Janesville Cases*.

The *North Milwaukee Case* (93 Wis. 616, 621, 622, 67 N. W. 1033) is relied on as one that overrules *Smith v. Janesville*. On the contrary, that decision is there approved. The court, recognizing the rule that a law might become effective on the happening of some future event, said:

"Such laws as these are very frequent, and, in fact, they are sometimes absolutely necessary to accomplish the best purposes of legislation. Such laws were considered, and their validity affirmed, by this court in *State ex rel. Att'y Gen. v. O'Neill*, 24 Wis. 149. See, also, *Smith v. Janesville*, 26 Wis. 291."

In *Adams v. Beloit*, 105 Wis. 363, 369, 81 N. W.' 869, 870, the court said:

"A law otherwise unobjectionable is not invalid simply because power is given to some local officials or body of electors to determine the existence of a fact upon which it shall go into effect in the given locality, if the law itself is a complete law upon the statute books. This is not the delegation of power to make a law, but simply the delegation of power to determine or ascertain some fact upon which the action of the law which is complete in itself is to depend."

In support of what is quoted the cases of *State ex rel. Att'y Gen. v. O'Neill* and *Smith v. Janesville* are cited.

Again, secs. 1548 and 1550 of the excise law (R. S. 1878) were amended by ch. 296, Laws of 1885, so as to empower the electors of the several towns, cities, and villages in the state to determine within certain fixed limitations the amount of a license fee to be exacted therein. It was contended that this act attempted to confer legislative power on the electors. This court, in *State ex rel. Faber v. Hinkel*, 131 Wis. 103, 108, 111 N. W. 217, 219, said:

"The people at such election were not empowered to legislate, but create or declare the fact upon which became effective the behest of the legislature that the sum to be charged for a license shall be $350 to $500, according to such fact. Such behest was a general law."

The cases of *State ex rel. Att'y Gen. v. O'Neill* and *Smith v. Janesville*, among others, are again cited in support of the rule enunciated. And in the *Railroad Commission Case*, 136 Wis. 146, 163, 116 N. W. 905, 911, this court quoted with approval the following language from *State v. Parker*, 26 Vt. 357, upon which the decisions in *State ex rel. Att'y Gen. v. O'Neill* and *Smith v. Janesville* were really based:

"It makes no essential difference what is the nature of the contingency, so it be an equal and a fair one, a moral and a legal one, not opposed to sound policy, and so far connected with the object and purpose of the statute as not to be a mere idle and arbitrary one."

It 'is obvious, therefore, that the decision in *Smith v. Janesville* is not a neglected or despised waif in the sea of judicial decisions, but is one that has never been doubted nor criticised by the court that promulgated it, and one that has been frequently cited as authority and referred to with approval.   Indeed, the laws involved in *State ex rel. Faber v. Hinkel, supra,* and *State ex rel. Williams v. Sawyer Co.* 140 Wis. 634, 123 N. W. 248, were general laws applicable to the entire state, although the different local political entities therein might adopt or reject their provisions.

The case of *Smith v. Janesville* involved the constitutionality of ch. 102, Laws of 1866, which amended sec. 20, ch. 71, R. S. 1858, entitled "Of the Incorporation of Banking Associations."   Sec. 53 of ch. 71, R. S. 1858, provided that the act might be amended by any future legislature, but that no amendment thereto should have any force or effect until submitted to a vote of the electors and approved by them.   As the constitution then was, the legislature was prohibited from enacting any general or special law on the subject of banking, but might propose a law on the subject and submit it to a vote of the electors.   Secs. 4, 5, art. XI, Const.   The provision for the taxation of state banks was embodied in the general banking law contained in ch. 71, R. S. 1858, which had been approved by the people. Ch. 102, Laws of 1866, materially modified this method of taxation, and it is argued that it was an amendment to the general banking law and was therefore necessarily submitted to a vote of the people; that the court should have sustained the referendum feature of the law on this ground; that the court reached a correct conclusion by an untenable process of reasoning; and that in such a situation the reasoning on which the decision is based should be rejected as *dictum.*

This is not a correct view of the situation that confronted the court in the *Janesville Case.*   The attack in that case was directed to the part of said ch. 102 which provided for

the taxation of national banks. ' As to those corporations the state had neither the power to create nor to regulate them, and the constitutional provisions quoted could not affect them either directly or remotely. By sec. 41 of ch. 106 of the act of Congress of June 3, 1864 (13 U. S. Stats. at Large, 111), the states were empowered to tax the capital stock of national banks in the manner therein provided. State legislation was necessary in order to tax these institutions in the manner authorized. Manifestly laws to that end should be passed in the same way that other general taxation laws were passed. There was nothing connected with the subject of taxing national banks that required a law pertaining thereto to be submitted to a vote of the people. It was not necessary that such an act should be combined with one providing for the taxation of state banks. A reference to the briefs shows that the contention of counsel in the *Janesville Case* was that, while it might be proper enough to refer so much of the law as pertained to the taxation of state banks to a popular vote, there was no authority whatever for referring that part of the law relating to the taxation of national banks, and that therefore the act had no force or effect as to such banks. The decision of the court meets this argument by saying, in effect, that a referendum on any general law is constitutional because the power to make the law is not thereby delegated to the electors. We see no escape from the proposition that the *Janesville Case* properly raised and presented to the court every question that is there decided. It seems to us that the law under consideration, in so far as it applied to national banks, was sustained on the only ground upon which it could be sustained, and that no part of that decision can be considered as mere *dictum*.

The decision in *Smith v. Janesville* follows *State ex rel. Att'y Gen. v. O'Neill,* 24 Wis. 149, although the latter case involved the right of the legislature to refer a law local in character to the electorate. It is said in the *O'Neill Case,*

however, that there is no difference in principle in this re-
gard between a local and a general law, and this view is ap-
proved in the later case.   Counsel for the appellant concede
that the ultimate conclusion reached in the *O'Neill Case*
was correct, and that as to matters purely local or municipal
the legislature may enact conditional laws and refer it to the
people locally to decide whether such laws shall become ef-
fective in the municipalities in which they reside, and the
following cases are cited as so holding: *Slinger v. Henneman,*
38 Wis. 504; *Ryan v. Outagamie Co.* 80 Wis. 336, 50 N. W.
340; *Adams v. Beloit,* 105 Wis. 363, 81 N. W. 869; *State
ex rel. Faber v. Hinkel,* 131 Wis. 103, 111 N. W. 217;
*State ex rel. Boycott v. Mayor, etc.* 107 Wis. 654, 84 N. W.
242; *Borgman v. Antigo,* 120 Wis. 296, 97 N. W. 936.   The
general current of authority elsewhere is to the same effect,
although, aside from Wisconsin, the cases hold that a general
law, using that term in its broad sense, may not be referred.
See cases cited 10 Cent. Dig. 1392.

We think this court was right in saying, in *State ex rel.
Att'y Gen. v. O'Neill* and in *Smith v. Janesville,* that no
good reason existed for applying a different rule to a local
law than that applicable to one not local.   The constitution
nowhere expressly recognizes any such distinction, and it is
difficult to see how it does so by implication.   Sec. 22 of
art. IV empowers the legislature to confer on boards of
supervisors powers of a local legislative character.   But this
provision is entirely silent as to the right of the legislature to
confer on the electors of a county the power to say whether a
law shall become operative or not, regardless of whether such
law is made directly by the legislature or by a county board
by virtue of authority delegated to it.   Sec. 3 of art. XI
makes it the duty of the legislature to provide for the organi-
zation of incorporated cities and villages.   This provision
carries no suggestion or legitimate inference to the effect

that the legislature in carrying out its provisions may delegate to the voters of the municipality the right to say whether or not the provisions of a law shall become operative within its boundaries. Aside from the two provisions referred to, we do not find any clause in the constitution that could reasonably be interpreted as recognizing the distinction between the two classes of laws that seems to have been generally recognized by other courts. If a difference exists it must exist by virtue of the organic law and not because the court may think that the framers of the law would have acted more wisely had they recognized the distinction and provided for it. Courts cannot supply what they deem to be unwise omissions from the constitution.

In reference to the distinction between the right of referendum as to local and general laws, Judge Cooley asks these pertinent questions, which are not answered by the cases in those courts which recognize such distinction:

"May not any law framed for the state at large be made conditional on an acceptance by the people at large, declared through the ballot-box? If it is not unconstitutional to delegate to a single locality the power to decide whether it will be governed by a particular charter, must it not quite as clearly be within the power of the legislature to refer to the people at large, from whom all power is derived, the decision upon any proposed statute affecting the whole state? And can that be called a delegation of power which consists only in the agent or trustee referring back to the principal the final decision in a case where the principal is the party concerned, and where perhaps there are questions of policy and property involved which no authority can decide so satisfactorily and so conclusively as the principal to whom they are referred?" Cooley, Const. Lim. (7th ed.) 168.

Nor can we concur in the views of some courts that the approval of the referendum principle will tend to make legislators shirk responsibility and become cowardly and corrupt. By indulging in flights of imagination we can often picture

grave consequences resulting from apparently harmless and innocent acts. Courts cannot presume that legislative power will be abused, nor that legislators, otherwise inclined to be honest and fearless, will become craven and dishonest simply because the right of referendum is upheld; and we should not approach the important matter of interpreting our constitution with the assumption that corruption is rampant and that trust and confidence may not safely be reposed in coordinate branches of the government. If officials in high places prove recreant to the trusts reposed in them, the remedy lies in another direction.

It frequently happens that laws are proposed which involve a radical departure from the existing order of things. The wisdom of the proposed innovation may be a matter of well-grounded doubt, and the enactment of the law may be a matter of grave concern to the public. A law when enacted affects the people of the state, and not merely the lawmakers who made it. Members of the legislature simply act as servants and representatives of the people who elect them. These representatives are chosen in a democracy because it is impracticable for the people to assemble and make their own laws. Under our form of government the majority may not always be right, but it must of necessity rule. The majority of the people is as apt to be right as is the majority of the legislature. Where, in a doubtful case, there is any impropriety in the agent's consulting the wishes of his principal upon questions of general public policy is not readily perceivable. If the act which the agent proposes doing is detrimental to the best interests of the state, it is the principal who suffers in consequence thereof. Wherein serious harm will result by securing an expression of opinion from the principal is not apparent. No consideration of sufficient moment is suggested to warrant a departure from the decision in *Smith v. Janesville.*

2. It is next contended that ch. 451, Laws of 1903, never

became effective because the act was not published after the electors had voted to adopt it.

By sec. 21 of art. VII of the constitution it is provided: "The legislature shall provide by law for the speedy publication of all statute laws. . . . And no general law shall be in force until published."

Sec. 329, Stats. (1898), was enacted pursuant to the foregoing requirement, and provides that every general law shall be published in the official state paper before it becomes effective, and that such "publications shall be made immediately after the passage and approval of the said laws, under the direction and supervision of the secretary of state."

Sec. 28 of said ch. 451 provides that the act shall take effect and be in force from and after its passage and publication, subject to the provisions therein contained for submission to the people.

The act was signed by the governor on May 23, 1903, and was published on June 3d following. It was also published before its submission to the electors at the general election held in November, 1904.

If the act delegated legislative or executive power to the electors there would be great force in the objection raised to its publication. We have already said that it does not do so, but falls within the same category as other laws that become operative on the happening of some contingency, and that such an act is a complete law when it receives the executive sanction and is published, although it does not take effect presently. The approval referred to in said sec. 329, Stats. (1898), undoubtedly refers to executive approval. In view of the conclusions reached there is no more reason for saying that this act should have been published after it was ratified by the popular vote than there would be for saying that any other law which does not become effective except on the happening of a contingency must be published after the contingency arises in order to have vitality.

3. It is next urged that said ch. 451 violates sec. 4, art. I, of the constitution, which provides:

"The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged."

In support of this contention it is urged that, prior to the enactment of the law, delegates assembled in convention, nominated candidates for office, promulgated party platforms, and discussed measures pertaining to the general welfare; that they are now debarred from naming candidates or making party platforms, as heretofore, and to that extent their former privileges are abridged. Furthermore, that the right to name party candidates by convention was recognized before the constitution was adopted, and that not only should the constitutional right of assemblage be protected, but also the necessary incidents to such rights.

What the constitution guarantees is the right of assemblage and of consultation. Ch. 451 does not interfere with that right. The people or their delegates may now assemble, hold conventions, and consult as they did formerly. The law does provide that certain things which were done at conventions by delegates representing the people must now be done by the people themselves at an election, and that other things which were done by conventions must now be done by the candidates nominated for office. It would be rather far-fetched to say that, because some acts were performed by assemblages before the constitution was adopted, a perpetual right is guaranteed thereby that these particular acts must for all future time be performed in the same manner. In lieu of congregating at caucuses and selecting delegates to assemble and represent them, the voters may now assemble at the polls in the different polling places and consult and express their choice of candidates. There is no curtailment of the right guaranteed by the constitution. At best there is but a substitution of methods by which the selection of can-

didates is to be made. The right of any political party to assemble in convention and consult for the common good is unimpaired. Since the Australian ballot has been adopted and is printed and distributed at public expense, it is entirely proper for the legislature to prescribe reasonable regulations governing the manner in which names may be placed on that ballot.

The courts of Oregon and Louisiana hold that primary election laws like our own do not infringe upon the right to assemble and consult for the common good. *Ladd v. Holmes,* 40 Oreg. 167, 66 Pac. 714; *State ex rel. Labauve v. Michel,* 121 La. 374, 46 South. 430. Such rights have always been held to be subject to reasonable regulation. Cooley, Const. Law, 280; Freund, Police Power, § 480; Stimson, Fed. & State Const. 49. Our own court, in *State ex rel. Runge v. Anderson,* 100 Wis. 523, 533, 534, 76 N. W. 482, 486, used the following language, which is entirely appropriate and applicable to the question under discussion:

"Manifestly, the right to vote, the secrecy of the vote, and the purity of elections, all essential to the success of our form of government, cannot be secured without legislative regulations. Such regulations, within reasonable limits, strengthen and make effective the constitutional guaranties instead of impairing or destroying them. Some interference with freedom of action is permissible and necessarily incident to the power to regulate at all, as some interference with personal liberty is necessary and incident to government; and so far as legislative regulations are reasonable and bear on all persons equally so far as practicable in view of the constitutional end sought, they cannot rightfully be said to contravene any constitutional right."

The cases cited as sustaining the view that the right of assemblage and consultation is impaired by ch. 451 are *Britton v. Board of Elec. Comm'rs,* 129 Cal. 337, 61 Pac. 1115, and *State ex rel. Ragan v. Junkin,* 85 Neb. 1, 122 N. W. 473. Neither case is in point. The Nebraska law provided that

certain candidates should not be "nominated, indorsed, recommended, censured, criticised or referred to in any manner by any political party, or any political convention or primary, or at any primary election." It is obvious that this statute violated both the letter and the spirit of the constitutional provision under discussion. To say that a candidate who may be wholly unfit for office may not be "criticised or referred to in any manner" at a political convention, primary, or primary election is clearly a denial of the right of assemblage to consult for the common good.

The California case does not hold that, by denying to political conventions the right to nominate candidates and make party platforms, its constitution was violated. The California primary election law denied the right of a place on the primary ballot to any party that did not at the preceding election cast three per cent. of the total vote. It was this provision of the law that was held to contravene the constitutional guaranty of right of assemblage and consultation. Our act fixes one per cent. The Australian ballot law also requires that a party cast one per cent. of the total vote in order to entitle it to a place as a party on the election ballot. Sec. 30, Stats. (1898). This provision was held valid in *State ex rel. Runge v. Anderson, supra.* If valid as to a place on the election ballot, no good reason is apparent why it should not be valid as to the primary ballot.

It may be a debatable question whether or not primary elections are an improvement on the methods which they superseded. Many states have such laws, and no state having once committed itself to the primary principle seems to have as yet receded from it. If ch. 451 is a violation of sec. 4, art. I, of our constitution, on the grounds urged, then the state is irrevocably committed to the caucus and convention method of naming candidates and building party platforms until such time as the constitution is amended. It is highly improbable that our constitution makers intended that

any such result would follow from a provision practically taken from the English Bill of Rights, and which was framed to meet grave abuses of a very different character. Such intention would entirely ignore those altered conditions which the mutations of time bring about, and would be tantamount to an egotistical declaration that when the constitution was framed the millenium had arrived and progress had reached its ultimate goal. Unless we read something into the constitution which we do not find there, we are unable to see how the third objection to the law can be upheld.

4. It is next contended that ch. 451, Laws of 1903, violates the rule of uniformity guaranteed by the state and federal constitutions. Under this assignment of error it is argued (1) that a person nominated for an office by nomination papers, as provided in secs. 30–32, Stats. (1898), may secure all the signatures to his petition that he is able to secure, while a candidate for nomination on a party ticket to be voted for at the primary is restricted as to the number of signatures which he may procure and is therefore discriminated against; (2) that the primary law permits electors to vote for candidates for a party with which they do not affiliate and the nominees of which they have no intention of supporting at the election; (3) that the provision in the law, which requires a candidate to file with his nomination paper, or within five days thereafter, a declaration that he will qualify for the office if nominated and elected, is void because it prescribes a qualification for office additional to that required by the constitution.

We fail to see much force in the argument that there is any discrimination in favor of the candidate who secures a place on the election ballot by virtue of nomination papers and against the candidate who seeks to secure a place on such ballot as the nominee of some political party at the primary election. The one is seeking the nomination of his party, and, if successful, secures the manifest advantages that fol-

low therefrom; the other is a free lance, who usually depends on his individual efforts to secure his election. Unless we have similarity of conditions there is no discrimination. As between candidates at the primary election who seek party nominations there is no discrimination. Any person who desires to secure a place on the election ballot by means of nomination papers may resort to this method and secure all the signatures he is able to. There may have been, and doubtless were, considerations of sufficient gravity to lead the legislature to restrict the number of signatures that a candidate for a party nomination should secure. Some of these considerations are obvious and have no application to an independent candidate who is seeking an election to an office. It is difficult to see where the elector or the candidate is deprived of any substantial right or in fact any right. The nomination paper is signed so as to give the people an opportunity to vote for the nominee as the candidate of some specified party at the primary election. When the requisite number of signatures is secured for this purpose, the object for which nomination papers are circulated is accomplished, and the candidate is placed in a position where all the electors may vote for him if they choose. The electors are not deprived of any substantial right because they may not be able to sign a petition, since every object that could be gained by such action has already been accomplished. Since the adoption of the Australian ballot law political parties have been necessarily recognized by various statutes. The ballots are printed and distributed at public expense. The names of party nominees must be placed thereon. In order to do this there must be some authoritative way of determining who the party nominees are. This in turn renders it permissible at least for the legislature to make reasonable regulations as to how party nominations shall be made.

In *State ex rel. Ragan v. Junkin,* 85 Neb. 1, 122 N. W. 473, it was held that a law was void which restricted the

number of signatures which an independent candidate might secure to his nomination papers. The decision has little value as authority upon the question we are here considering. The clause of the Nebraska constitution to which the court held that the law was inimical is not found in our constitution, and neither does it contain any provision of like tenor and effect. Furthermore, it was held that, under and because of the peculiar restrictions of the Nebraska law, a candidate might be deprived of the right to have his name placed upon the official ballot. This presents a very different situation from that presented where the candidate has more than a sufficient number of signers to entitle him to a place on the primary ballot so that all may vote for him who desire. The restriction on the right of the candidate and of the elector, contained in the primary election law, is by no means as serious or substantial as are certain restrictions pertaining to the Australian ballot law which have been sustained. *State ex rel. Runge v. Anderson,* 100 Wis. 523, 76 N. W. 482; *De Walt v. Bartley,* 146 Pa. St. 529, 543, 24 Atl. 185; *Independence Party Nomination,* 208 Pa. St. 108, 112, 57 Atl. 344; *Oughton v. Black,* 212 Pa. St. 1, 61 Atl. 346; *Miner v. Olin,* 159 Mass. 487, 34 N. E. 721; *Cole v. Tucker,* 164 Mass. 486, 41 N. E. 681; *Comm. v. Rogers,* 181 Mass. 184, 187, 63 N. E. 421; *State ex rel. Zent v. Nichols,* 50 Wash. 508, 97 Pac. 728. These decisions establish the rule that legislation on the subject of elections is within the constitutional power of the legislature so long as it merely regulates the exercise of the elective franchise and does not deny the franchise itself either directly or by rendering its exercise so difficult and inconvenient as to amount to a denial.

The second objection urged under the fourth assignment of error is that the primary election law permits a voter, without regard to party affiliations, to vote at a primary election for candidates of any party he chooses to select, whether he is a member of that party or not or whether he ever intends

to become such, and thus provides for their opponents an opportunity for disrupting and destroying political parties through the selection of improper candidates.

It is true that members of one political party may vote at the primaries for candidates of a different political persuasion. That this has been done, or will be done in the future, to any greater extent under the primary election law than was practiced under the caucus system that existed before the adoption of the primary law, may well be doubted. That any considerable following of one political creed will deliberately desert their own party at the primary to foist an unworthy set of candidates on a rival party presupposes a degree of moral turpitude that we cannot presume to exist. The rule of ethics which prompts members of one political persuasion to dictate the candidates or the policy of another may not be commendable, but we agree with the supreme court of Washington that the objection is political rather than judicial and should be remedied by the legislature instead of by the courts. *State ex rel. Zent v. Nichols, supra.* The law certainly presents an anomalous situation in this regard, if the legislature considered it important that party integrity should be preserved.

The contention that to require a candidate to declare that if nominated and elected to an office he will qualify adds a qualification not required by the constitution, we regard as untenable. It is hardly making a qualification to require a man to say that if the people see fit to nominate and elect him he will serve. The electors have the right to know whether he will or not; otherwise, if he should decline, their votes would be thrown away. They ought to have the right to express a choice as between candidates who are willing to assume the duties of office if elected. The case of *Dapper v. Smith,* 138 Mich. 104, 101 N. W. 60, cited by appellant, arose under a very different statute from the one we are considering, although some language is used in the opinion by

way of argument which is not inapplicable to the situation before us. The Michigan law required that, before the name of any candidate for office was placed on the ballot to be used at a primary election, the candidate should on oath declare his purpose to become such. Sec. 1 of art. XVIII of the Michigan constitution prescribes the oath which shall be required of public officers, and further provides that no other oath, declaration, or test shall be required as a qualification for any office or public trust. It was held that the statute violated the constitution by imposing an additional oath, and therefore an additional qualification, on the candidate to that required by the constitution. Our statute does not require an oath, and we have no such negative provision in our constitution as is contained in that of Michigan, except that no religious test shall ever be required as a qualification for office.

5. Lastly, it is contended that the law under consideration is void because it provides for the nomination of party candidates for the office of United States senator at the primary election.

Sec. 3 of art. I, Const. U. S., provides that senators shall be chosen by the state legislatures. Sec. 4 of the same article permits the various states to prescribe the times, places, and manner of holding elections for United States senators, but authorizes Congress to make or alter such regulation. Congress has legislated very fully upon the subject, as will be seen by a reference to secs. 14 to 19, R. S. of U. S. (U. S. Comp. Stats. 1901, pp. 7, 8). Such legislation supersedes any state legislation covering the same subject matter. *Patterson v. Belford,* Ellsw. Elec. Cas. 52; *Turney v. Marshall,* 1 Bartl. Elec. Cas. 167.

It is argued that said ch. 451 contravenes both the provisions of the federal constitution and of the federal statutes referred to, in that it, in effect, provides for an election of United States senators by popular vote.

The purpose of incorporating sec. 3 of art. I in our national constitution is apparent from a reading of the clause. If there were any doubt upon the subject a recurrence to the debates in the constitutional convention would remove it. It was written into our organic law through fear of popular government in its broadest sense, and because it was thought that the state legislatures would be more competent to select a desirable class of senators than would the people. However we may presently view the fear alluded to, it was not an unnatural one 123 years ago when the foundations of a government were being laid that approached measurably nearer a true democracy than did any other then in existence or that had been for centuries. As careful men engaged in an experimental undertaking of great moment, the framers of the constitution cautiously sought to avoid the dangers that loomed up on the horizon of their perspective into the future, and the excesses of so-called popular government in France a few years later would lend support to the view that the fears indulged in were not wholly chimerical. Indeed, both before and since the adoption of our constitution, history has been replete with examples of that true Jedwood justice meted out by the populace where the accusation and conviction were simultaneous and preceded the investigation if it were even considered worth while to make one. The constitution, and the first ten amendments thereto adopted as early as 1791, show a well-defined purpose to protect the right of the individual against tyrannical and arbitrary government. That governments of and by the people, as well as despotisms, might become arbitrary seems to have been taken for granted. In free England attainder on conviction of a crime with corruption of blood was abolished only by the statute of 33 and 34 Vict. During and after the Revolution, acts of attainder were passed in several of the American states. 1 Bouv. Law Dict. 190. So it was feared, with reasonable apprehension, that in times of excitement and tumult when passions were

State ex rel. Van Alstine v. Frear, 142 Wis. 320.

aroused, the populace, acting through representatives directly chosen by the electors, might indulge in a riot of laws subversive of private rights. To secure a house of Congress not so remote from the people as to be unaccountable to them, and yet distant enough to be able to withstand popular outbreaks of passion and vindictiveness and assaults upon the rights of the citizen, was the problem which confronted the convention. Having first concluded that it was essential that such a body should be provided for, it was finally concluded that by giving senators a comparatively long term of office, by providing that but one third of the membership should be elected every two years; and further that the selection should be made by the people's representatives in the state legislatures instead of by the people themselves, the desired end could be attained. Widely variant views were entertained on the subject. Some delegates thought that the senators were being removed too far from the people; others that they were not being removed far enough. The clause as finally adopted, like most of the provisions of the federal constitution, was the result of a compromise, on which a middle ground between that occupied by the extremists on either side was agreed to. With the wisdom or unwisdom of this conclusion the courts are not concerned. It is their sworn duty to interpret the law as they find it; not to make it as they think it should be. It is better that bad laws be enforced than that courts should usurp the functions of the lawmaking power, and by inadmissible construction, or otherwise, defeat its will. If a constitutional provision was unwise in its inception or has become unsuited to our wants, there is a legitimate method provided by which it may be eliminated. If a legislative act is unwise or vicious it may be repealed, but for the courts to set up their own standards of what the law should be and to defeat our constitutions themselves, or laws which did not conflict with them, would be intolerable. While some of the constitutional restrictions

referred to may have operated to the detriment of the body
politic at times, yet, when the evils they have prevented are
weighed in the balance against those they have wrought, it
would be a bold assertion to say that a single one of them
was, or is, inimical to the public welfare, or that it has been
a more potent agency in creating mischief than it has been
in promoting good.

The constitution unequivocally vests in the legislatures of
the several states the power to elect senators.   This can only
mean that it is made the duty of the legislators to meet, con-
sult, and exercise their conscientious judgments in making a
choice, having in mind always that they are the agents and
representatives of those who sent them and that the wishes of
the people are entitled to grave consideration.   But if it be
the object and purpose of this law to shift the burden of, and
the responsibility for, the election of United States senators
from the legislature to the electorate; if our legislators are
to play the parts of automatons and become mere passive in-
struments by and through whom the will of the voters is to be
carried out; if to them is left the perfunctory duty of ratify-
ing the action of the voters at the primaries, as the members
of our electoral college confirm the result of a presidential
election; if the electors in reality elect United States senators,
instead of the legislature,—then the constitutional scheme has
been superseded and the spirit of the constitution has been
evaded and disregarded.   Performing the empty ceremony
of recording the wish of some other body is vitally different
from expressing and recording independent thought and
judgment.

But before we can convict the legislature of having abdi-
cated its functions and of having violated the constitution in
doing so, it is necessary to analyze what it has done.   It is a
settled principle of constitutional law that legislative acts
should not be declared unconstitutional unless they clearly
run counter to the letter or the spirit of some provision of

our constitutions.   It is just as well settled that, if a legislative act is reasonably susceptible of two constructions, one
of which would render the act void and the other valid, it is
the duty of the courts to adopt the one which does not destroy
the act.   This is a reasonable rule, because it is not to be presumed that a co-ordinate department of the government intended to violate the state or national constitution.   The provisions of ch. 451, Laws of 1903, pertaining to the election
of United States senators are few and easily understood.

Subd. 3 of sec. 2 provides that party candidates for the
office of United States senator shall be nominated in the manner provided therein for the nomination of candidates for
state offices.

Subd. 1 of sec. 6 provides that nomination papers for candidates for the office of United States senator shall be filed in
the office of the secretary of state.

Subd. 1 of sec. 18 provides that the person receiving the
greatest number of votes at the primary as the candidate of
the party for the office voted for shall be the candidate of that
party for such office.

Subd. 2 of sec. 18 requires the secretary of state to publish
in the official state paper a statement of the result of the canvass of the primary as soon as the same is certified to him.

The foregoing excerpts embody all the requirements found
in the law that pertain to United States senators.   Not a
word is said in the act about requiring legislative candidates
to pledge themselves to support the nominee of the party.
The law in terms imposes no duty upon any member of the
legislature to vote for any person who was a candidate before
the primary.   Neither does it restrict the choice to some
person who was voted for thereat.   Should this court assume that the coercive power of a nomination for senator at
the primaries is so great as to destroy volition on the part
of members of the legislature and convert them into mere
voting machines?   The first and only election of a senator

since the primary law was passed would indicate that very many members of the legislature did not so interpret the law, and we have little reason to suppose that any of them did. Certainly, the fact that a majority finally voted for the nominee of the primary proves nothing. The same result might have followed if no primary had been held.

The law on its face does not convey the impression that it contains a sinister assault upon sec. 3 of art. I of the federal constitution. On the contrary, the purpose of the provision relating to the nomination of United States senators may not only be lawful but may be entirely praiseworthy. Formerly political conventions met principally for the purpose of nominating candidates and promulgating party platforms. These functions are now performed at the primaries and by the candidates nominated thereat. While conventions may still be held, the necessity for holding them has largely been obviated, and it was no doubt thought by the legislature that they would be of infrequent occurrence. Such conventions, when held, very often expressed a choice of candidates for the senatorship. Senatorial and assembly conventions usually passed resolutions requesting their nominees to use all honorable means to secure the election of a favorite candidate. They furnished the only available means by which a candidate might become advised of the wishes of his constituency on this important subject. It is not only permissible, but is proper, that he should receive such advice. That advice can now be conveyed most effectively through the vote at the primary.

It should always be borne in mind that the people are the masters and that the members of the legislature are their servants, and that the agent should always give due consideration to the voice of the principal. In order to regard it he must hear it. It is none the less true that the agent, by his oath of office, swears that he will defend the constitutions, state and federal, and perform the duties of his office to the

best of his ability, and when *vox populi* points in one direction and our organic laws in the other, we must assume that the agent will courageously obey the behest of his oath and his conscience. It is not apparent how our primary law can be held to be so coercive as to destroy judgment and discretion on the part of a member of our legislature when he comes to perform the duty of electing a United States senator. Where the majority for some candidate is large, great deference should and no doubt will be accorded to its voice. When public sentiment does not materially preponderate in favor of a single candidate, it may have a comparatively slight influence in inducing a legislator to cast his vote in favor of a candidate who has received a bare plurality of the popular vote; and where the vote of the constituency of the individual member is decidedly adverse to the successful candidate, it may well have a tendency to lead him to oppose rather than support the nominee.

Our constitutions, state and national, guarantee the right of petition. Every citizen of the state has the right to petition the legislature asking that the candidate of his choice be elected United States senator. Every citizen of a senatorial or assembly district has the right to petition his local representative to the same effect. The lawmaker is thus advised of public sentiment, a potent factor for him to consider in connection with other matters in arriving at a conclusion. Wherein does the primary nomination for United States senators differ from the exercise of the right of petition? The legislative candidate is thereby informed of something that he has the right to know and of something that it is his duty to heed. He may not regard the verdict at the polls as obligatory, but should treat it as advisory. Moral suasion may be a perfectly legitimate agency to employ even in the election of a United States senator. That the electors in the exercise of their guaranteed right of petition might do in substance and effect what they now do at the primaries hardly

admits of controversy. The framers of the constitution could not have supposed that there was any impropriety in the people advising their representatives of how they desired them to vote on the senatorship, else an exception would have been incorporated in the clause guaranteeing the right of petition, restricting its application to matters other than the election of United States senators.

As is said in *State ex rel. McCue v. Blaisdell* (N. Dak.) 118 N. W. 141, the action of the electors in reference to a candidate for United States senator "amounts to nothing more than the right of petition, a right which they cannot be denied." The North Dakota law involved in this case contained a provision requiring nominees for the state legislature to sign a pledge to vote for the candidate of their party who received the nomination at the primary for the office of United States senator. This provision was held to be unconstitutional and void, because it was an attempt to coerce the members of the legislature to abdicate their right to use their individual judgments in making a selection, but it was also held that such void provision did not affect the remainder of the act.

Authorities elsewhere on the point under consideration are not numerous, but such as we have are to the effect that a law such as ours, providing for the nomination of candidates for the office of United States senator at a primary election, is valid. *State ex rel. McCue v. Blaisdell, supra,* and *State ex rel. Labauve v. Michel,* 121 La. 374, 46 South. 430. We do not wish to be understood as indorsing all that is said in the opinions in these cases, but do coincide with the conclusions reached to the extent here indicated.

A word might be said as to the contention that the legislature is deprived by this act of the power to make nominations for the office of United States senator. It may be conceded that the power to elect implies the power to nominate. But there is nothing in the act which forbids the members

of the legislature making nominations or even prevents the holding of party caucuses.

Construing the law as imposing no legal obligation on the part of any member of the legislature to vote for his party nominee at the primary, we must assume that the legislators will vote according to their consciences and convictions, giving due weight to the advisory vote of the people, and that therefore neither the letter nor the spirit of the constitution has been transgressed.

*By the Court.*—Order affirmed.

The following opinion was filed April 5, 1910:

MARSHALL, J. I concur with much reluctance in the decision that our constitution permits general laws to be made by the referendum method. . I concur on the ground of *stare decisis,* only, the court having taken the position, now followed, over forty years ago and not since departed therefrom.

I concur in the decision that the primary election law does not violate the Bill of Rights because it not only does not prohibit the holding of political conventions or declarations thereat of party principles, but rather contemplates such action, nor does it prohibit the suggestion of candidates as before, subject to approval at the primary. In short, in practical effect it does not prohibit the doing of those things formerly done, and supposed to be necessary, to insure party success, but the right to assemble in conventions, to declare party principles and suggest candidates is permissible. It is not only not illegal nor against public morals, but is lawful and commendable as ever.

I concur in the decision that the act as to nominating candidates for United States senator is valid for the reasons stated in the court's opinion, which, in short, I understand to be that the act leaves the members of the legislature as free as

State ex rel. Van Alstine v. Frear, 142 Wis. 320.

formerly to exercise their judgment upon such evidence as they can obtain; that under the act, as before the act, it is not only their right but it is their duty to exercise their own judgment, and not to act as mere agents to carry out the judgment of others; that the act creates neither a legal duty nor moral obligation to carry out the verdict at the primary, except as it coincides with their deliberate judgment after being advised by the result of the primary and in other proper ways.

This brief memorandum will in due time be followed by a brief discussion of some phases of the primary law.

The following opinion was filed April 21, 1910:

MARSHALL, J. (*concurring*).   When this case was decided I filed a memorandum of points understood by me to be covered by the court's opinion, to be followed by a concurring opinion.   This is pursuant thereto.   I will endeavor to show: (a) As an original matter, a law cannot be made by creating one, in form, leaving it to the people to or not to convert such form into law in fact; (b) the significantly alleged features of the primary law, which, were they in fact a part of it, would, doubtless, render it unconstitutional, are not there either in its letter or spirit; (c) liberty of action alleged to be unconstitutionally restrained or prohibited, on the contrary is contemplated and encouraged; (d) the feature as to United States senators does not impose any duty on nor permit surrender of, by members of the legislature, their respective judgments.

The foregoing challenges attention as involving questions of far-reaching importance.   Nothing approaching the dignity of the matter often comes to this court.   Individual shades of thought and lines of logic, leading to final conclusions in which the justices concur, could not easily, if at all, be indicated in an opinion, speaking with the necessary sin-

gleness of the court, yet such individual logic may give much force to the legal and moral effect of the thought in the aggregate, which must stand out as that of the court. Expression of individual judicial views on great constitutional questions, is always permissible, is often advisable, and is sometimes, seemingly, almost necessary. For added vindication of the court's position and of my own guarded concurrence in one respect and emphatic concurrence in others, after a careful study and analysis of the primary act, and for the good it may do in dignifying and entrenching our valuable principles of constitutional liberty, lifting them so far above any existing tendency to encroach upon the sacred field of inherent human rights, as to minimize danger of any one of them being destroyed or seriously impaired,—this opinion is written. The labor is not indulged in with any thought of mere exploitation of individual ideas, but rather of judicially aiding in keeping significantly in view, those principles which the constitution builders aimed to declare and have preserved, unimpaired, as an essential part of our system, and at the same time, of vindicating the wisdom of the legislature wherein it has been severely criticised and its legitimacy confidently challenged. To do the latter, while upholding the constitution in all its integrity, not swerving one way—giving appearance of impatience with its restraints and a purpose to reduce them to a minimum as much as possible, which method would result in practical nullification—nor the other, suggesting narrowness on the part of the fathers, which they were, in fact, entirely free from; but taking that broad view which gives the constitution the effect intended, viz.: to secure the inherent rights of men.

It seems that overleaping desire for change, at times colors mental views, so that men are wont to survey our system from the viewpoint of ancient conceptions of man's status; that one's liberty and property and freedom to enjoy and acquire the latter are mere privileges afforded by grace of a sov-

ereign, instead of ours, which displaced it, that all those mere privileges of the ancient system are inherent rights, not rights conferred by any human power, nor subject to be taken away by such power; *but birthrights;* that they may be regulated; but that regulation to be legitimate must be within the spirit of the constitution, *i. e.* to preserve, to secure their integrity and competency to conserve human enjoyment; that at the dividing line between regulation which conserves and that which impairs, is the one between the legitimate and the illegitimate, in legislation. Danger of encroaching upon this line, which is sometimes seen in legislative acts passed or proposed, was foreseen, as well as importance of vigilance to guard against it. So the fathers closed the fundamental guarantees by this admonishment:

"The blessings of a free government can only be maintained by a firm adherence to justice, moderation, frugality and virtue, and by a frequent recurrence to fundamental principles."

So recurring I will endeavor to discuss the questions involved in this case.

I yield very reluctant concurrence with the idea that it is constitutional for the legislature to pass a general act to become a law upon its being approved by popular vote. I yield upon the ground of *stare decisis* only. I dissent from the view that such an act is sustainable from an original standpoint, and that there is no logical distinction between a local act to become law *in præsenti,* but be operative only in such localities as by popular vote adopt it, and a general act, presently proposed by the legislature, to be a law when approved by popular vote.

True, this court, in *State ex rel. Att'y Gen. v. O'Neill,* 24 Wis. 149, 154, upheld the referendum principle as to a local option law and said, entirely *obiter,* approving the reasoning in *State v. Parker,* 26 Vt. 357, 365, that it is illogical to sustain such principle as to a local option law and to condemn a

general act to take effect as law only upon approval by popular vote, and such *obiter* remarks were given judicial approval in *Smith v. Janesville,* 26 Wis. 291. But I cannot ascribe such infallibility to the reasoning supporting such early observations as to adopt it now as sound. When it was made the question involved was new. Since then it has received attention by many courts.

The Vermont case, in the extreme, does not appear to have been followed there. Each decision cited therein either involved a local option law or has been displaced where made by some later decision. Neither the Vermont case nor *Smith v. Janesville* has been followed anywhere in such a case as this, while the doctrine thereof has been condemned over and over again. *Barto v. Himrod,* 8 N. Y. 483, 490, which the Vermont court, and this court following Vermont, criticised as not authoritative, has, since such criticisms were made, been affirmed, most emphatically, many times. *People v. Fire Asso.* 92 N. Y. 311; *Gilbert E. R. Co. v. Kobbe,* 70 N. Y. 361; *Matter of Thirty-fourth St. R. Co.* 102 N. Y. 343, 7 N. E. 472; *People v. L. I. R. Co.* 134 N. Y. 506, 31 N. E. 873; *Stanton v. Essex Co.* 191 N. Y. 428, 84 N. E. 380.

*People v. Collins,* 3 Mich. 343, which the Vermont court ignored because of the justices being evenly divided, as was said, was explained in *Feek v. Town Board,* 82 Mich. 393, 47 N. W. 37, the doctrine of the New York court being fully adopted restricting the referendum principle to local option laws, it being said that in *People v. Collins,* "No one of the judges contended that, had the effect of the submission of the act been to determine whether" it "should become a law or not," it "would have been valid." Adding: "The power of the legislature . . . to pass an act, and then to take the sense of the people whether it shall become a law or not, was not admitted nor has it ever been in this state." The supreme court of Pennsylvania, also cited by the Ver-

mont court, subsequently took the same view. *Comm. ex rel. McClain v. Locke,* 72 Pa. St. 491. If there is a decision following *Smith v. Janesville,* as to the precise question here, counsel were not able to find it and we have not been more successful.

As to local option laws, even, the referendum principle has been, by many courts, reluctantly sustained and by divided courts quite often. *Fell v. State,* 42 Md. 71; *State ex rel. Maggard v. Pond,* 93 Mo. 606, 6 S. W. 469; *Paul v. Gloucester Co.* 50 N. J. Law, 585, 15 Atl. 272.

*Barto v. Himrod, supra,* has been followed in many jurisdictions which uphold local option laws, as does the New York court. *Ex parte Wall,* 48 Cal. 279; *Ex parte Anderson,* 134 Cal. 69, 66 Pac. 194; *State v. Weir,* 33 Iowa, 134; *State v. Metcalf,* 33 Iowa, 610; *Lytle v. May,* 49 Iowa, 224; *Eckerson v. Des Moines,* 137 Iowa, 452, 478, 115 N. W. 177; *Lammert v. Lidwell,* 62 Mo. 188; *Rice v. Foster,* 4 Harr. (Del.) 479; *Parker v. Comm.* 6 Pa. St. 507.

True, *Smith v. Janesville* has been referred to here with approval, not, however, to the point now involved, but to the general proposition that the legislature can make "a law complete in itself" and leave the question of its enforcement to turn upon future ascertainment of some fact or happening of some contingency. Note the significance of the language: "a law complete in itself." The infirmity here, as courts generally have viewed the matter, is the legislative effort did not create a law "complete in itself," as in case of a local option law. It left to popular judgment whether a proposal should or should not be a law. It made a form only for a law, leaving it to the people to vitalize it, by evolving it into a law. That seems unmistakable. It was provided that whether the act "shall take effect . . . shall be submitted to the people of this state. . . . If approved by a majority of the votes cast upon that question, it shall go into effect and be in force from and after such ratification by the people."

Such contingency of its becoming a law, fixing the time thereof, if at all, as that of popular approval, is the precise distinguishing characteristic between such laws and local option laws, which has resulted in the general condemnation of the former. They are not "laws complete in themselves" upon emanating from the legislature, with executive approval, but mere propositions to the people of acts for their adoption as laws, or rejection. In all New York cases that distinction is clearly drawn, as a few quotations will clearly show.

In *People v. Fire Asso.* 92 N. Y. 311, 316, affirming *Barto v. Himrod,* 8 N. Y. 483, the court said:

"As to the school law, the people were made the legislature, and left to decide whether the bill proposed should or should not become a law. . This court held that the legislature, under the constitution, could not so delegate its power, but was bound to determine for itself the expediency of the measure, and either enact or reject it."

Again, in *People v. L. I. R. Co.* 134 N. Y. 506, 31 N. E. 873, the court, approving the early case, declared thus:

"The difficulty with the statute there was . . . that it provided for the submission to the electors to determine whether the act should or should not become a law."

Again, in *Gilbert E. R. Co. v. Kobbe,* 70 N. Y. 361, this language was used:

"The existence of the law itself in that case [*Barto v. Himrod*] was made to depend on the vote of the people."

Lastly, in the very late case of *Stanton v. Essex Co.* 191 N. Y. 428, 432, 84 N. E. 380, the court said:

"The senators and assemblymen are selected by the electors of their respective districts to represent them in the legislature of the state and to enact such laws as shall be requisite and advisable. The people, who have intrusted them with legislative power, have the right to demand the exercise of their knowledge, judgment and discretion in the framing

and in the enactment of laws, and in so far as their duties are strictly legislative, have prohibited them from delegating that power to others. It was consequently held in *Barto v. Himrod*, 8 N. Y. 483, that an act establishing free schools throughout the state was unconstitutional and void, for the reason that the fact of its becoming a law was made to depend upon the result of popular vote."

Other courts are quite as emphatic. To illustrate, in *Lammert v. Lidwell*, 62 Mo. 188, 194, we read:

"It is not only the right of the representatives, when assembled in the legislature, to make laws, but it is their duty to do so. When the people, through the constitution, delegated the lawmaking power to the legislature, it conferred an authority and imposed a duty which could not be exercised by any other body of men. Therefore, every law, to have any binding force or validity, must, when it emanates from the legislative body, have the form and character of a complete enactment. It must operate by virtue of the legislative authority, and not depend upon popular action or the people's suffrages for its vitality."

And further, in effect, whether an act shall or shall not be law cannot be made to depend upon its existence as law upon popular vote. And further, citing approvingly the logic of the supreme court of New Jersey:

"The will of the legislature must be expressed in the form of a law by their own act. If it is left to the contingency of a popular vote to pronounce whether it shall take effect, it is not the will of the lawmakers, but the voice of their constituents, which moulds the rule of action. If the vote is in the affirmative it is law; if in the negative it is not law. The vote makes or defeats the law, and thus the people are permitted unlawfully to resume the right of which they have divested themselves, by a written constitution, to declare by their own direct action what shall be law."

Pages of judicial learning of the character above given might be quoted. The idea, that a vote of the people favorable to a proposed law, without which it cannot be "a law complete in itself," is a contingency upon which "a law com-

State ex rel. Van Alstine v. Frear, 142 Wis. 320.

plete in itself" is dependable for vitality, is generally re-jected.

Existence or nonexistence of a law is one thing. That in-volves wholly matter of expediency and is wholly within the legislative field. Whether a law "complete in itself" shall be put in force is another. It is the latter which may be made to depend upon a future contingency. It seems the court, in the *Janesville Case* (26 Wis. 291), confused the two, holding that a mere proposal for a law, complete in form, is "a law complete in itself," within the meaning of local option decisions, and so reached the conclusion, in effect, that the contingency upon which a proposed form for a law may be law in fact may be a favorable popular vote.

The foregoing sufficiently shows why I cannot concur with all grounds for the decision on the first point discussed in the court's opinion. The doctrine that laws may be made by the referendum process—and I cannot escape the con-clusion that such is the effect of the rule followed—seems to be subversive of one of the basic principles of our form of government. While the constitution declares that the chosen members of the legislature shall be the lawmakers, such doc-trine is to the effect that they may lay the burden upon the people at large.

I cannot bring myself to concur with my brethren on the first point, even on the ground of *stare decisis,* without ex-treme hesitation. I would prefer to join, if it were possible, in overruling *Smith v. Janesville,* and make the law of this state harmonize with that of the country generally. The court would be warranted in that, to save an important con-stitutional principle, especially where it will not disturb any rule of property. It should be done now, if ever, as to the point under discussion. However, my brethren being unan-imous on the ground of *stare decisis,* primarily, I will concur but not on any other.

It is dangerous for a court to refuse to correct an early

mistake on a great question of constitutional law, where a remedy may be applied without disturbing vested personal or property rights. "Consistency is a jewel" as applied to judicial holdings as well as to human actions in general, yet it is not so priceless but what it were better to sacrifice it, in some instances, than to purchase it in exchange for a fundamental principle.

In the foregoing there is no purpose to condemn, in the slightest degree, as an original matter, the making of laws by the referendum process. Such method may be, from an original standpoint, the height of wisdom. The question is, What is the policy incorporated in the constitution? If that be not the best, it should be changed if at all in the constitutional way, not by subverting the fundamental law. The same power that established one way can change or abolish it altogether. The wisest course, the safest course, and the only right course, is to maintain the integrity of the constitution as we find it, till the power which made it sees fit, in the manner provided by it, to change it.

The government of this country, as said by Chief Justice MARSHALL in *Marbury v. Madison,* 1 Cranch, 137, is a government of laws and not of men. That fundamental idea must not be forgotten. Any departure from it endangers the very purpose of government to conserve our birthrights. The constitution is the paramount law. Legislatures and judges are sworn to support it as they find it, regardless of their notions of expediency from an original standpoint. It having delegated power to make laws to a particular agency, that agency is exclusive. If it were for legislatures or courts, by any ingenious contrivance, to do in one way what the people, in the exercise of their original right to create a governmental fabric, ordained shall be done in a particular way, such assumed omnipotence to abuse or abdicate a trust would neutralize the dominant feature which is the crowning idea of any written constitution. It is upon these consider-

ations that I so question the referendum method of making law, regarding *Smith v. Janesville* to have seriously invaded our constitutional system. Yet by long tacit adherence thereto, the error, as we have seen, has become so implanted in our system that, standing alone, I could not change it if I would. Because of the futile character, at this late day, of a formal dissent, I submit to go with my associates, expressing no opinion as to whether it were better that the people had, unquestionably, reserved unto themselves authority to both initiate and make laws.

I concur that the primary act does not violate the guaranteed right to "peaceably assemble to consult for the common good" nor the general spirit of the constitution guaranteeing liberty of citizens to maintain political parties and to do all things reasonably necessary to make party organizations effective to secure vitality of their principles. I concur for reasons stated in the court's opinion, and for others necessarily inferable therefrom, and for still others.

It is contended for appellant that the legislature cannot prohibit party conventions and declarations thereat of party principles. I understand the learned attorney general to freely concede that, but to contend there is no such prohibition. Appellant's counsel concede there is no express prohibition, as the fact is, but suggest that the spirit of the law supplies want thereof; that such has been the practical construction of the law, and that it should be treated accordingly.

So it is, in effect, argued that the law should be viewed in its spirit and condemned the same as if what is suggested to be in spirit included therein, were expressed in the letter. The constitutionality of a law is not to be thus tested. It is to be upheld as legitimate, unless it is otherwise beyond reasonable doubt. If in letter, it is constitutional, it should be sustained as thus expressing the legislative purpose, rather than to seek by construction, for a meaning which will require its condemnation. The letter may be violated to sus-

tain an act in its spirit, if in the latter it is legitimate though in the former it is not. It should not be unnecessarily viewed in a supposed spirit to condemn it, since it is not to be thought the purpose of a lawmaking power, in any instance, to have been to violate the constitution.

It must be conceded that, under our form of government, political parties are promotive of public welfare; that they cannot exist without organizations and that the organizations cannot exist without freedom to assemble in mass or delegate conventions for the purpose of consultation as to party policies and declaring such policies. Therefore, it is not reasonable, unless it is unavoidable, to conclude any legislative enactment to have been intended to abolish or abridge opportunity to do those essential things or to make doing the same, or any thereof, contrary to public morals. On the other hand, it would seem that the holding of party conventions should be regarded as not only permissible but commendable, instead of reprehensible, in the absence of unmistakable words in the written law to the contrary. Perfect freedom, in that regard, has existed from the foundation of our American system. Its continued existence is necessary to the maintenance of that system. Common sense teaches it; experience affirms it; the constitution in spirit guarantees it; and every court that has spoken on the subject has recognized and dignified it.

The supreme court of California in *Britton v. Board of Elec. Comm'rs,* 129 Cal. 337, 61 Pac. 1115, voiced the common judicial sentiment in these words:

"No one can be so ignorant as not to appreciate the value, indeed the necessity, of opposing political parties in a government such as ours. No one, it would seem, can be so thoughtless as not to realize that government by the people is a progressive institution which seeks to give expression and effect to the wisest and best ideas of its members. No declaration is needed in the Declaration of Rights to the effect that electors holding certain political principles in common may

freely assemble, organize themselves into a political party, and use all legitimate means to carry their principles of government into actual operation. . . . It is inherent in the very form and substance of our government and needs no expression in the constitution."

And further, in effect, conventions of political parties have long been known in the history of this country. The right of members of a political party to freely assemble, deliberate and act, to promote the interest of such party, is a right guaranteed by the constitution, state and national. Freedom to do those things, reasonably appropriate to the effective maintenance of party organization, cannot be abridged. "Self-preservation is an inherent right of political parties as well as of individuals." The California court, in connection with these emphatic declarations, freely acknowledged the constitutional right of such regulation of political parties as serves to promote their legitimate end, while denying the existence of that power of regulation which would turn a shield designed to protect into a sword to destroy.

Every court which has considered any of the numerous modern efforts to regulate the process of selecting party candidates for public office, has recognized not only the legitimacy but the importance of political parties. Regulation acts all dignify that idea, making political parties a part of the election instrumentalities of the state. The purpose, and the only legitimate one, of such an act is to regulate for conservation, not for prejudicial restriction or destruction. In construing such an act, if in its letter or from one point of view such purpose is violated, courts should look at it in some other aspect, or in its spirit, if need be, taking into consideration the abuses designed to be corrected and all appropriate rules for judicial construction, in order to arrive at a meaning within the scope of the language used in the act, consistent with guaranteed rights.

True, history under the primary act would indicate that

the idea had taken root that it prohibits holding party con-
ventions with any of the former usual purposes.   But one
will search the law in vain to find any such idea therein, or
anything to reasonably lead to that conclusion, except that
a party candidate, however suggested, cannot have his name
placed on the official ballot unless he receives, at least, a
plurality approval of such members of his party as may see
fit to vote at a primary election conducted as the law provides.

It being conceded that political parties are necessary under
our system and assemblages of some sort of party members
are appropriate, if not necessary, to their effective main-
tenance, that the primary act contains no prohibition in that
regard, it is useless to claim that the act either outlaws politi-
cal conventions or makes the holding of the same contrary to
public morals.

It is suggested that the law unreasonably interferes to pre-
vent the making of party platforms in convention as well as
the nomination of candidates thereat, since it provides a
different way for each.    True, as it seems, only to the extent
that the party platform as it may be promulgated by a party
convention, or other party authority, must be put into its
final form by the party candidates nominated at the primary,
and that candidates, if suggested at a convention, must ob-
tain indorsement at the primary as a condition precedent to
their names being placed on the official ballot.    The required
indorsement may well have been, and doubtless was, consid-
ered by many, at least, who voted for the primary act, a
means of rendering ineffective such abuses in securing a place
on the official ballot by the old way, as had in the judgment
of some commonly occurred, and were liable to occur again,
by compelling a candidate, notwithstanding the convention
indorsement, to stand the test of the primary as well.

Not only is there perfect freedom of party action as indi-
cated, for aught there is in the primary act, but I think it
clearly contemplates such action.    Such indications are

many. They were, doubtless, incorporated therein for the very purpose of preventing successful attack upon its validity. I will specify some of them.

Existing political organizations of parties were not, in any respect, abolished or prohibited. Moreover they were dignified as a part of the state election system, as we have seen.

Sec. 21 requires creation of all political committees which had been customary, from state committees down to committees of voting precincts. Such preservation and dignification of the old organizations must have been for a purpose. It would be unreasonable to suppose that such a perfect system was preserved as a mere matter of form; that the legislative thought was to preserve such political machinery and yet destroy the effectiveness thereof. It must have been thought, by many at least, who consented to pass the act, that the party committees so carefully provided for, in harmony with existing conditions, and the members of the respective parties, would be left free to do, in general, everything commonly done which was not prohibited. The inference to that effect seems irresistible from the fact that, after providing for all the usual committees, they were not prohibited from acting as before, except in so far as inconsistent with the act. Consistency would obviously require convention candidates to secure indorsement at the primary before having their names placed on the official ballot and a specified indorsement before having their names go on the primary ballot. There is no express or implied prohibition of convention nominees having their names, in due course, so placed, and, if it were otherwise, there would probably be no division of opinion as to its being an illegitimate interference. But to put the matter beyond all reasonable controversy, the legislature industriously provided that "Each committee and its officers shall have the powers usually exercised by such committees, and by the officers thereof, in so far as is consistent with this

act." And, further, to prevent even temporary interference with other party operations as theretofore, it was provided that the existing nonofficial committees should, till the election of their successors under the primary law, exercise all power mentioned.

Now as to the declaration of party principles by which electors must test their political status, there are clear indications that pre-primary announcement by conventions or by some party authority was contemplated. How could a candidate know, with any definiteness, the principles of his party in advance of some such declaration? Is it reasonable to suppose it was contemplated that knowledge of the party principles would be postponed till the declaration by the candidates should be given out as provided in sec. 22 of the act? The idea of nominating a party candidate without knowledge *in præsenti,* of the party principles for which he will stand, leaving it to him and his associates to proclaim to the members of the party the party principles, has appeared so absurd as to be pointed to as a most glaring infirmity of the act. That idea, in my judgment, is no more a part of the law, in fact, when reasonably construed, than the one that it prohibits holding party conventions. It not only is not in the act, but significant features thereof clearly, to my mind, negative its being there.

One of the features suggested is in sec. 5. Each signer of a party nomination paper is required to proclaim therein the party to which he belongs, and that he nominates the candidate named by him "as representing the principles of said party" and that he intends to support such candidate. Does not that, necessarily, presuppose common present knowledge by members of the party of the party principles? Does it not clearly negative the idea that candidates after being nominated are to then proclaim to those who nominated them what their principles are, in respect to which all had previously pledged themselves? How could one make his affi-

State ex rel. Van Alstine v. Frear, 142 Wis. 320.

·davit without party principles having been, by some party authority, made known prior thereto? How could they be so made known, except by a party conference at which all members of the party would have opportunity to be heard personally, or representatively, through operation of party machinery? Moreover, how could one named at the primary to stand for party principles make the affidavit required by secs. 11–18 of the primary act, as amended—that he will ·qualify if elected, in effect, making oath that he will, if elected, take office and strive to vitalize the principles of the party,—unless, in contemplation of law, he then knows what those party principles are? How can he then know them if the party platform is to be made instead of merely "formulated" at the meeting required to be held under sec. 22, since the latter event is required to occur long after the former? Again, how can the party principles, referred to in the nomination paper, or contemplated in the affidavit of the party ·candidate, have any reference to the, now customary, personal declaration of a party candidate as to where "he stands"—something very novel, if not unheard of before the primary law? Does not the required declaration under oath ·of the party nominator and that of the party nominee, condemn the idea that the mere personal declaration of a would-be party nominee as to "where he stands," is the test ·of party faith prescribed by party authority, to which both nominator and nominee are required to pledge themselves? The personal declaration may be known when the nomination paper is filed, but very little, if any part of it, may be embodied in the "formulation" of the platform, which subsequently occurs. It could not stand as a party pledge, in any ·event, except in a personal party sense, since not put forth by political party authority. Yet the declarant—if a somewhat popular notion of the primary law is right—is liable to find himself in the dilemma of trying to ride several political horses at the same time, one of his own creation before

the primary, one created by some party authority prior to the signing of the nomination papers, one created by himself and associate candidates subsequent to the primary, and one created by the national party authority.

The idea that the primary law was framed on the lines suggested should not be thought of for a moment, if the words thereof do not unmistakably require it. When we see that the scheme in all its parts contemplates some authoritative declaration of party principles before the signing of nomination papers, and with reference to which the nomination pledge would be made and to which future action would be referable, all parts of the law harmonize with a rational conception, and all supposed unreasonable and so unconstitutional interferences in respect to the matter, disappear.

Further plain indications that the primary act contemplates knowledge of the party principles to be contended for at the coming election, before signing nomination papers, is found in sec. 22. While it provides for a meeting of party candidates for platform purposes, it does not provide that they shall make a platform, but that they shall "formulate" one. Why did the legislature so industriously use the word "formulate" if "make" was meant? Formulate is satisfied without making at all, in the sense of an original declaration of principles. The common meaning of the term "formulate," is to reduce to a form; to express in formula; to put in a clear and definite form of statement or expression. To originate is one thing; to put in concise form of expression understood principles is another. That the law contemplates the latter only, is made plain because it provides that upon the day for the meeting of candidates for platform purposes, they shall "forthwith formulate" (put in concise form of expression) "the state platform of their party." No time is allowed for deliberation, as in case of an original declaration of party principles. All is consistent with there having been, previously, such a declaration. Candidates are re-

quired to meet at 12 o'clock noon and "formulate" the platform "before doing any other business." Thereupon they are required to do much other prescribed business, all other proper business desired and to publish the platform before 6 p. m. the day following that of the meeting.

Why such haste? Is it at all consistent with the idea of that deliberation and discussion of, and agreement upon party policies, necessary to the making of a party platform in the ordinary sense and which the constitution guarantees opportunity for? At the same time is it not perfectly consistent with the idea of the party policies being known at the time of making the pledge by nominators and affidavits of nominees? The suggested answers make sec. 22, supposed by many to be absurd, and pointed to as an altogether senseless, a fair enactment.

I concur that the feature of the primary act as to nomination of candidates for United States senators, properly construed, is not unconstitutional, for reasons stated in the court's opinion, which will bear further elaboration.

It cannot be made too plain or too emphatic that, while the national constitution remains as it came from the fathers, all attempts to directly, or indirectly, nullify or materially weaken the requirement that United States senators shall be chosen (appointed) by state legislatures, must fail. The dignity of the provision in that regard has not been appreciated by some courts which have dealt with the matter.

It has been said by some courts, quite correctly, that the action of the primary is no more or less than a method of exercising the right of petition and that the agents petitioned to are no more bound thereby than in any other case of like manifestations of desire. In others, it has been said, quite loosely, that the result of the primary does not create a legal duty; it only creates a species of obligation. How there can be a legal obligation without a corresponding duty, is hard to perceive. The logic, in the literal sense, seems absurd. If

it be meant an obligation to respectfully consider the wishes of the petitioners and their reasons in connection with all other matters bearing on the question, in forming judgment respecting exercise of the constitutional power of appointment, I perceive no infirmity in it. If it means an obligation, legal or moral, to surrender the discretion incident to the constitutional power of appointment vested in the members of the legislature, then, manifestly, the law, so construed, would be nugatory.

One of the most troublesome questions in the constitutional convention was, whether senators should be elected by the people or appointed by the state legislatures. There were two radically different schools on the subject, and a third of lesser significance, as indicated in the court's opinion.

The views of those who advocated leaving the duty of selecting senators with the state legislatures as an appointing power, prevailed and for reasons, in the main, inconsistent with an election directly, or indirectly, by the people, or the members of the legislature acting in the discharge of their duties otherwise than according to their own unbiased, uncoerced judgment. The term "elected" was eliminated and the term "appointed" used instead in the final act of the national drama. This was the form in which the matter was put: "Motion for an appointment of the senators by the state legislatures." On this all the states represented, ten in number, voted "Aye." Rhode Island, New Hampshire, and New Jersey were not represented in the final vote.

The school of statesmen which advocated election by the people did not submit to the convention plan. In the contest over the question of ratification, the merits and demerits of such plan were fully discussed, the leaders in the affirmative being Hamilton, Madison, and Jay. They argued that the very purpose of a senate required the appointment of its members to be removed from the source of selection of members of the popular branch, as far as practicable; such pur-

pose being to prevent popular impulses *in præsenti,*—liable
to be produced by the appeals of well-meaning theorists or of
thoughtless demagogues bent on promoting selfish ends by
arousing unreasonable prejudice,—to be regretted upon re-
flection and consideration after reason had resumed its cus-
tomary sway, from controlling in directing the important
affairs of government of a great people. It was said that
there was as much danger from the abuse of liberty as from
the abuse of power, and that while one body should be se-
lected by such method as to minimize the danger of the latter
the other should be selected by a far different method, one
most likely to guard against danger of the former.

In harmony with the peculiar functions of the senate to
secure the country against danger of hasty action under the
impulse of popular clamor of the hour, and to furnish the
element of conservative force requisite to a stable, safe gov-
ernment, on the basis of our American conception of the
rights of men, it was in effect urged that the senate should
have a dignity and permanency and independence of mere
momentary popular interference, akin to the high judicial
status, and so should have the source of selection of its mem-
bers removed from that of the popular branch. Mr. Madi-
son, speaking on the subject, said:

"It must be politic to distinguish them from each other by
every circumstance which will consist with a due harmony in
all proper measures and with the genuine principles of re-
publican government."

Referring, in support of that idea, to the lessons of history,
it was said, in substance: No republic ever long existed
without a senate and in case of one, permanency was pro-
moted or otherwise as the plan of organization assimilated to
the one proposed. Such a body as the proposed senate has
never been successfully oppressively dominant but been, in
the long run, uniformly a conservative force making for the
public good and the strength and permanency of the govern-

ment. Selection of members of the higher branch, designed to be the legislative balancing feature, can best be made by a deliberative, representative body, selected by the people. The tendency has been for the popular branch to encroach upon the senate rather than for the latter to encroach upon the former. As the power of the senate for the purposes of its creation became weakened the government became weakened also and the tendency was to decay.

After a long period of public discussion and of education the people adopted the constitution, fully understanding that the members of the respective legislatures, untrammeled by interferences with the exercise of judgment, would be charged with the important duty of appointing United States senators.

Can it be supposed that, had the question of whether it was competent for the people, by a primary election method, to impose upon the members of a legislature, either a legal duty or a moral obligation to surrender their respective individual judgments in respect to the choice of a United States senator, come before the first great judicial expounder of the constitution, Chief Justice MARSHALL, with all the circumstances of the adoption of the convention plan before him, there would have been any hesitancy in answering in the negative?

It must not be lost sight of that United States senators are federal, not state officers. The legislature of a state has no more right to change the appointing power reposed in it by the federal constitution as to the matter in question than in respect to any other power lodged by the constitution in it exclusively. It has no more authority to abdicate its functions by descending from its constitutional status as a repository of federal appointing power, to the level of a mere agency to effectuate the result of a popular choice, as indicated by a vote of the people, than it has to provide that the justices of this court shall, in applying the law, submit to be guided by popular advice or judgment.

If the system as stated is not the best policy, independently of fundamental limitations, it can only be legitimately changed by the power of the people of the country at large, in the exercise of their constitutional right to change the constitution. There can be no legitimate mere state interference, and all ingenious contrivances to that end should fail and fail utterly. If a course of action which, with good motives or bad motives, could successfully improperly interfere in one field it could do so in all directions, and the skill of those who might be impatient of the fundamental restraints which, properly applied, would limit their capacity to vitalize their theories of government, would not be found inadequate, in practical effect, to subvert the constitution altogether; that instrument which has been characterized by statesmen on two continents as the greatest single achievement of the human mind in the century in which it was produced.

The logic of the court's opinion on this last branch of the case, to me, seems unanswerable. If the primary act were construed as imposing upon members of the legislature, either the legal duty or moral obligation to abide by the verdict rendered at the election, it would require judicial condemnation. It can only be supported on the theory that it is merely advisory, from the standpoint of citizen petitioners as of the time of holding the primary, and of much, or little or no significance whatever, according to circumstances.

It might manifestly be the duty of members of the legislature belonging to a particular party to vote for some other person than the one petitioned for by members of such party, who voted at the primary. He might have but a small minority support of the party though having a plurality. He might be found on investigation not to be truly representative of the party principles. The aspect of his candidacy might entirely change in the interim between the primary and exercise of the appointing power, so that the advice of the party petitioners who voted at the primary, under different circum-

stances could not properly have any weight and the petitioners would, in the new situation, as largely concur in their former advice being ignored as they did in giving it. So it is not only the right but the sworn duty of members of the legislature to exercise their respective official judgments, giving to the result of the circumstantial preference suggested at the primary, just such weight as, in their wisdom, may seem best and no more. In that view, the part of the act under discussion is sustainable and not otherwise, and such is but elaborating the views of the court, as I understand them.

Construed as the court construes the primary law, and as I view it, consistent with the court's decision, it is free from the imperfections which have been commonly pointed out as grounds for condemning it and it is, throughout, a fair, sensible, constitutional piece of legislation. Of its wisdom I need not speak. If the practice under it and the common criticisms of it have been upon a false theory, one which if incorporated therein would render it destructive and void instead of regulative and beneficial, that is not the fault of the law, but of the people in following false theories, as I think, instead of asserting and enjoying their constitutional rights, which are rather conserved than injuriously interfered with, by the law.