GERALD J. FERWERDA, Executive Secretary State Elections Board
You request my opinion on the question of whether Wis. Const. art. XIII, sec. 12 or sec. 9.10, Stats., should be applied to provide for recall of a member of the United States Senate. Your question is occasioned by the possibility that petitions for such a recall may be *Page 141 
filed with the Elections Board. Because of your concern regarding the validity of Wisconsin's recall provisions under the United States Constitution you feel it necessary for the Board to determine whether it should carry out its apparent responsibilities under sec. 9.10, Stats.
Wisconsin Constitution art. XIII, sec. 12, approved by vote of the electorate in November, 1926, provides:
 The qualified electors of the state or of any county or of any congressional, judicial or legislative district may petition for the recall of any elective officer after the first year of the term for which he was elected, by filing a petition with the officer with whom the petition for nomination to such office in the primary election is filed, demanding the recall of such officer. Such petition shall be signed by electors equal in number to at least twenty-five per cent of the vote cast for the office of governor at the last preceding election, in the state, county or district from which such officer is to be recalled. The officer with whom such petition is filed shall call a special election to be held not less than forty nor more than forty-five days from the filing of such petition. The officer against whom such petition has been filed shall continue to perform the duties of his office until the result of such special election shall have been officially declared. Other candidates for such office may be nominated in the manner as is provided by law in primary elections. The candidate who shall receive the highest number of votes shall be deemed elected for the remainder of the term. The name of the candidate against whom the recall petition is filed shall go on the ticket unless he resigns within ten days after the filing of the petition. After one such petition and special election, no further recall petition shall be filed against the same officer during the term for which he was elected. This article shall be self-executing and all of its provisions shall be treated as mandatory. Laws may be enacted to facilitate its operation, but no law shall be enacted to hamper, restrict or impair the right of recall.
Section 9.10, Stats., was enacted "to facilitate the operation of art. XIII, sec. 12, of the constitution and to extend the same rights to electors of cities, villages, towns and school districts." Section 9.10 (7), Stats., as amended by ch. 403, Laws of 1977. *Page 142 
You express the belief that both Wis. Const. art. XIII, sec.12, and sec. 9.10, Stats., would permit the use of the recall procedure for congressional offices. I agree, since the language "any elective officer" is broad enough to encompass congressional officers, and I am aware of nothing that would indicate otherwise. Indeed, prior to the adoption of the amendment in November, 1926, some critics charged that inclusion of congressmen raised federal constitutional questions. Since no federal constitutional issues would be raised if the recall were not to apply to federal elective officers, it appears that in the mind of some contemporaries of the amendment it was meant to include such officers.
It may be observed that there are two basic elements to the recall procedure under Wisconsin law. First is the referendum on the question of removal of a named incumbent. Second is an election to choose his successor in the event of such removal. Both of these elements raise constitutional questions. Regarding the first element, there is some question whether the United States Constitution vests in each house exclusively the power to remove members of Congress. As to the second element, the question is whether such an election is inconsistent with the scheme of federal regulation of congressional elections. Under the supremacy clause, U.S. Const. art. VI, cl. 2, any state law inconsistent with the Federal Constitution or with validly enacted federal legislation must fall to the extent of its inconsistency.
The provision of the United States Constitution pertinent to the question of removal is art. I, sec. 5, cl. 2, which provides:
 Each house may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member.
Does this power to expel so lodged in each house constitute the only method of removing a sitting member under our constitutional system? No definitive answer to this question has been given by competent authority. It has been recognized, however, that in general the right to expel extends to those cases where the action of the offending member is such that his house considers it inconsistent with the trust and duty of continued membership.In re Chapman, 166 U.S. 669 (1897).
Powell v. McCormack, 395 U.S. 486 (1969), is instructive in determining whether the expulsion power granted to each house in *Page 143 
art. I, sec. 5, cl. 2 should be viewed as the sole (constitutional) means of removing a sitting member of Congress. One of the issues to be decided in Powell concerned art. I, sec. 5, cl. 1, which provides in pertinent part: "Each house shall be the judge of the elections, returns and qualifications of its own members . . . ." The question was whether a house of Congress could prevent a member-elect from taking his seat because it did not deem him qualified. The Court held that Congress may only judge whether a member-elect meets the qualifications enumerated in the Constitution, such as those concerning age and residency, but could not add to them. Thus Congress has no power to exclude a member even on grounds of that member's immoral or criminal conduct. In reaching this conclusion the Court traced the history of the legislative power of exclusion from mid-sixteenth century England through the constitutional convention to the present. In demonstrating the framers' intent that the qualifications for membership in Congress be fixed in the Constitution and not be alterable by the Legislature, the Court quoted from Hamilton's speech before the New York convention:
 [T]he true principle of a republic is that the people should choose whom they please to govern them. Representation is imperfect in proportion as the current of popular favor is checked. This great source of free government, popular election, should be perfectly pure, and the most unbounded liberty allowed.
2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876), quoted in Powell, 395 U.S. at 540-541. The Court laid particular stress on the principle of protecting popular will in the selection of representatives from legislative obstacles:
 Had the intent of the Framers emerged from these materials with less clarity, we would nevertheless have been compelled to resolve any ambiguity in favor of a narrow construction of the scope of Congress' power to exclude members-elect. A fundamental principle of our representative democracy is, in Hamilton's words, "that the people should choose whom they please to govern them."
Id. at 547.
Powell is not directly in point, since it deals with the exclusion power under art. I, sec. 5, cl. 1, rather than with the expulsion power *Page 144 
under art. I, sec. 5, cl. 2. Therefore, it is not conclusive in determining whether the power of removal rests solely with the Congress. But it would be unwise to ignore one of the chief underpinnings of that case, namely, that the will of the people in selecting their representatives is not to be frustrated in the absence of clear and specific authority for doing so.
On the other hand, there is considerable evidence that the framers intended to contribute to the stability of the federal government by structuring one house, the Senate, to be more insulated from the potentially volatile popular will. The Wisconsin Supreme Court has said that the intent was: "To secure a house of Congress not so remote from the people as to be unaccountable to them, and yet distant enough to be able to withstand popular outbreaks of passion and vindictiveness and assaults upon the rights of the citizen." State ex rel. VanAlstine v. Frear, 142 Wis. 320, 345 (1910). See also James Madison's eloquent discourse on this subject in The Federalist, Nos. 62 and 63, pp. 376-390 (Mentor ed., 1961). Today, however, the Senate is less insulated from the popular will on account of the seventeenth amendment providing for direct popular election of Senators.
Removal of a member of Congress under Wisconsin's recall procedure is a most direct expression of the people's will in the selection of their representatives. Removal by recall does not on its face conflict with Congress' power of expulsion under art. I, sec. 5, cl. 2. Nor would the effect of recall necessarily thwart the operation of that clause. If removal by recall is deemed to be in conflict with the expulsion power of Congress, it would have to be because the framers intended expulsion by two-thirds of a house to be the sole method of removing a sitting member. It would not be appropriate for me, in an attempt to discern the framers' intent on this matter, to undertake here the same type of exhaustive historical analysis conducted by the Court inPowell. For the present, it is sufficient to note the Court's admonition "to resolve any ambiguity in favor of a narrow construction of the scope of Congress' power" when it is weighed against the people's right to "choose whom they please to govern them."
As noted above, the Wisconsin recall provisions, besides being a method of removal, also involve an election. The holding of congressional elections is subject to U.S. Const. art. I, sec. 4, cl. 1, which provides: *Page 145 
 The times, places and manner of holding elections for senators and representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of chusing Senators.
Thus, Congress has the power to regulate the time and manner of holding senatorial elections. Under the supremacy clause, state attempts to regulate such elections will survive in the face of congressional regulation (a) if and to the extent that the two are consistent and do not contravene one another, and (b) if Congress has not evinced an intent to occupy the field so that no state regulation will be allowed regardless of whether Congress has passed inconsistent legislation.
Congress has regulated senatorial elections by law. The pertinent provisions are 2 U.S.C. secs. 1 and 7.
Sec. 1. Time for election of Senators
 At the regular election held in any State next preceding the expiration of the term for which any Senator was elected to represent such State in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said State shall be elected by the people thereof for the term commencing on the 3d day of January next thereafter.
It will be noted that sec. 1 deals with regularly held congressional elections. There is nothing on the face of the statute to suggest that a provision for a special recall election would interfere with the congressional scheme for regulating the regular elections.
Sec. 7. Time of election
 The Tuesday next after the 1st Monday in November, in every even numbered year, is established as the day for the election, in each of the States and Territories of the United States, of Representatives and Delegates to the Congress commencing on the 3d day of January next thereafter. This section shall not apply to any State that has not yet changed its day of election, and whose constitution must be amended in order to effect a change in the day of the election of State officers in said State. *Page 146 
Under sec. 1 standing alone, the time for the regular election of senators was tied to the time a state had established for the biennial election of representatives. Section 7, fixing a uniform date for such elections, was later passed to eliminate the problems resulting from the election of members occurring at different times in different states. Ex parte Yarbrough, 110 U.S. 652,661 (1884). It is relatively clear, therefore, that sec. 7 also regulates the regularly held election. It does not on its face indicate any intention on the part of Congress to prohibit special recall elections.
Thus far it appears that Wisconsin's recall provisions are wholly consistent with Congress' statutory scheme for regulating the times and manner of elections as evidenced by 2 U.S.C. secs. 1
and 7, above. For nothing in connection with the recall would in any way impinge upon the regular election. If our recall provisions are to be deemed preempted, then, it would have to be because Congress intended to occupy the field, in effect precluding all state regulation in the area irrespective of consistency.
"It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed." Schwartz v.Texas, 344 U.S. 199, 202-203 (1952), quoted in New York StateDepartment of Social Services v. Dublino, 413 U.S. 405 (1973). I am not aware of any clear manifestation of Congress' intent to preempt otherwise compatible state regulation in this area. Therefore, I cannot state that our recall provisions would be declared unconstitutional on grounds of federal preemption.
In the foregoing discussion I have attempted neither a resolution nor a comprehensive analysis of the constitutional issue. Enough has been said, however, to show that the question of constitutionality is one that is arguable and open to debate. The Wisconsin Supreme Court has provided guidance to administrative bodies called upon to perform their ministerial duties under circumstances raising doubt as to the constitutional validity of the result.
In State ex rel. Sullivan v. Hauerwas, 254 Wis. 336 (1949), the issue was similar to the one here presented. Sullivan was a candidate for the office of circuit judge. Under Wis. Const. art. VII, sec. 10, to be eligible for that office a person must have attained the age of *Page 147 
twenty-five years at the time of his election. After Sullivan had filed his otherwise adequate nomination papers with the Milwaukee County Board of Election Commissioners, he was informed that his name would not be placed on the ballot because he admittedly was not old enough. The circuit court for Milwaukee County granted Sullivan's petition for a writ of mandamus compelling the Board to place his name on the ballot. The supreme court held that the circuit court did not abuse its discretion in issuing the writ. The court noted that the Board was:
 [A]n administrative body and may perform only those functions delegated to it by the Legislature. It has no authority to make findings of fact where the statutes are silent, and it has no authority to determine questions of law. The nomination papers were admittedly proper in every respect and the relator has a legal right to have his name appear upon the primary judicial ballot even though he may not be eligible for the office if elected.
254 Wis. at 340.
The position of the Wisconsin Supreme Court on this subject was most recently explained in State ex rel. Althouse v. Madison,79 Wis.2d 97, 109, 112, 255 N.W.2d 449 (1977):
 It is true that, in its [the court's] discussion of State ex rel. Sullivan v. Hauerwas . . . it pointed out that it would have been proper to deny a petition for a writ of mandamus to place a candidate of doubtful age eligibility on the ballot had that question been previously decided adversely to the petitioner; but it also recognized that, where no prior adjudication had taken place, mandamus was appropriate even though a substantial constitutional doubt was readily apparent.
 We have already referred to Sullivan, in which this court held that, although a question . . . of substantial constitutionality of the proposed action is raised, mandamus will lie unless there has been a prior and explicit adjudication of unconstitutionality on the very subject matter. In other words, where the unconstitutionality is arguable and open to debate, mandamus will nevertheless lie to compel performance. In State ex rel. Martin v. Zimmerman, 233 Wis. 16, 288 N.W. 454 (1939), the secretary *Page 148 
of state refused to publish a bill because of his belief in its unconstitutionality. This court rejected his defense and stated:
 "It is a thoroughly well-established principle of law that no person may raise the constitutionality of an act of the legislature who is not in his official capacity or personally affected by it."
Accordingly, in the event petitions for the recall of a United States senator are presented to the Elections Board, you should proceed to carry out your responsibilities under Wis. Const. art. XIII, sec. 12, and sec. 9.10, Stats., unless and until directed otherwise by a court of law.
BCL:GS